EDWARD L. KELTY, Plaintiff-Appellant, *v.* WISEMAN CONSTRUCTION COMPANY, INC., Defendant-Appellee.

Second District (2nd Division)   No. 75-215

Opinion filed June 3, 1976.—Rehearing denied July 7, 1976.

Mirabella, Facktor, Mirabella & Kincaid, of Wheaton, for appellant.

Lloyd E. Dyer, Jr., of Donovan, Atten, Mountcastle, Roberts & DaRosa, of Wheaton, for appellee.

Mr. PRESIDING JUSTICE THOMAS J. MORAN delivered the opinion of the court:

Plaintiff appeals from a denial of his motion for a new trial on the issue of damages only, following a jury award of $9200, which amount he claims to be palpably inadequate since it does not represent his out-of-pocket expenses.

Defendant counters that these damages are not palpably inadequate or, if they are, that they are the result of a jury compromise on the issue of liability and damages which renders improper the award of a new trial on the issue of damages only.

On January 2, 1973, plaintiff, a carpenter, was building an external wall on the second floor deck of a townhouse being constructed by defendant, general contractor for the project of 188 townhouses in Wheaton. During the preceding holidays, ice had accumulated on the deck and on building materials at the site. Plaintiff and a co-worker attempted to scrape the ice away before commencing work that morning. Plaintiff then began constructing an exterior wall in a manner customarily used in the trade: the 2″ side of a 2″ x 4″ (the "plate") is temporarily nailed parallel to and 4″

from the edge of a second floor deck; wooden studs are then laid at right angles on the floor and nails are driven through the plate into the studs. After this is accomplished the temporary nails holding the plate to the deck are removed and the structure is uprighted into place. As plaintiff was nailing 2″ x 4″ studs into the plate, his left foot (which was braced against the plate and the stud to prevent the latter from shifting) slipped from under him. The record does not indicate that plaintiff lost his footing as a result of any ice remaining on the deck. Plaintiff fell 10′ to the frozen ground below, fracturing the weight-supporting talus bone of his ankle. No safety lines, railings, nets, or other devices were provided to prevent such a fall.

The ankle was set in a plaster cast and plaintiff was hospitalized for 10 days. After leaving the hospital and while using crutches, swelling arose in the fractured ankle, and, to keep the leg elevated, a wheel chair was prescribed for his use through the month of May. The cast was removed in March at which time it was noticed that his ankle looked deformed, that the range of flexion in the ankle was substantially impaired, and that the big toe would not bend. Plaintiff was instructed to gradually begin bearing weight on his leg. Between March and July he took whirlpool treatments and, working first with wheelchair and crutches, then crutches, and later (in June) with a cane alone, he once again became ambulatory.

On July 2, 1973, he returned to work for the first time. He asserts that, on his return, he found his ability to perform his chosen occupation as rough carpenter permanently impaired because he could no longer pivot, walk on uneven ground, or climb ladders or scaffolding due to the reduced range of motion in the ankle. The ankle swelled and ached after a day's work. A year after the fall, an orthopedic surgeon (other than the one who had initially treated plaintiff) examined the ankle, found an impinging piece of bone, found evidence that the ankle bone was wearing away, and found that post-traumatic arthritis, usually a progressive condition, had developed at the fracture site. This surgeon suggested a brace to slow the ankle's deterioration and to relieve pain, and also indicated that plaintiff will probably need a major operation—an ankle fusion—to reduce the pain. Such an operation permanently removes all flexion from the ankle.[1]

At trial, the jury's general verdict awarded plaintiff $9200 in damages. Plaintiff asserts that this award is palpably inadequate because it does not compensate him for his proven out-of-pocket expenses: $1356.58 paid medical expenses, plus $9516 lost wages from January 3 to July 2, 1973, for a total of $10,872.58. This amount does not include future medical

---

[1] There was testimony by plaintiff's orthopedic surgeon that plaintiff's pursuit of his career of rough carpentry, with or without ankle fusion, would be painful and possibly dangerous due to the impairment in the movement of the ankle.

expenses to fuse the ankle, lost wages for the minimum of 3 to 4 months recuperative period which this procedure will demand, or for pain and suffering.

Defendant contends that the $9200 award was not palpably inadequate because it covers plaintiff's out-of-pocket medical expenses and because the jury may well have found plaintiff's lost wages to be less than the $9516 claimed.

■■ Defendant contends that the jury could have taken into consideration the seasonal nature of carpentry work and plaintiff's being subject to "off-time" due to lack of work after he returned from his injury. In a portion of a deposition used to impeach plaintiff's trial testimony, plaintiff said he was laid off by McHugh Construction Company in February of 1974, and that one of the reasons given by the company was lack of work. Under these circumstances, it is argued, the jury could have concluded that the lost wages proved were less than those claimed. To so conclude, the jury would have had to place great weight on a fact of marginal relevance (that defendant was laid off a year after the injury—when his ability to perform his duties was impaired by the injury) and would have had to assume a fact not addressed by the parties (that job availability or scarcity in the construction industry during the year of layoff was comparable to the subject year). Contrary to defendant's suggestion, we cannot presume that the jury made such a judgment.

■■ Defendant argues that proof of lost wages consisted only of the fact that plaintiff was injured while employed at a wage of $9.15 per hour, and there was no proof that he would have worked, had he not been injured, at the same hourly rate or that he would have been continuously employed for the same number of hours per week during the 6 months from January to July of 1973. There is evidence in the record, however, that plaintiff had been employed as a carpenter for 6 years, had worked for the same employer for 15 months, and was working full time even in the midwinter month of January on a large project of 188 townhouses. After his injury, when he was able, he returned to work for the same employer. As these proofs were uncontradicted, and there was no evidence that plaintiff would have worked fewer hours, have been laid off, or have worked for lower wages during this period, we believe there was sufficient proof to establish the lost wages claimed.

■■ In our case of *First National Bank v. Szwankowski*, 109 Ill. App. 2d 268, 275-76 (1969), we said:

"We are unable to imagine the misadventure the issue of damages suffered during the deliberations of the jury. It is apparent that the jury improperly assessed the amount of the damages for the verdict bears no reasonable relationship to the loss suffered by the plaintiff. The verdict does not even satisfy the

uncontradicted elements of damages relating to medical expenses and lost wages."

We held that damages awarded were palpably inadequate in that case, and we similarly hold here. See also *Hamas v. Payne*, 107 Ill. App. 2d 316 (1969).

■■ Our finding that the damages were palpably inadequate does not, automatically, necessitate the award of a new trial as to damages only. Where it appears that a damage verdict is a result of compromise on the issue of liability, the case may not be retried on the issue of damages only, for to do so could impose an injustice upon the defendant. Thus, a new trial, limited to the issue of damages, may be had only "where the damage issue is so separable and distinct from the issue of liability that a trial of it alone may be had without injustice." (*Paul Harris Furniture Co. v. Morse*, 10 Ill. 2d 28, 46 (1956); see *Szwankowski*, at 274-76.) To test whether a verdict is the result of compromise, it must be determined if the verdict was amply supported by the evidence. (*Harris*, at 46.) If the record discloses sufficient evidence for the jury to find defendant liable, the court may order a new trial on the issue of damages only. (*Cf. Maguire v. Waukegan Park District*, 4 Ill. App. 3d 800, 804 (1972); *King v. City of Chicago*, 53 Ill. App. 2d 484, 486-87 (1964).) We thus examine the proofs to determine whether there is sufficient evidence to sustain defendant's liability under either the Structural Work Act count or under the common law negligence count of plaintiff's complaint. The general verdict is sustainable if the evidence supports either ground for recovery. Section 68(4) of the Civil Practice Act, Ill. Rev. Stat. 1973, ch. 110, par. 68(4).

The negligence count alleges liability in that defendant did not meet its duty to supply plaintiff with a reasonably safe place to work. The other count charges defendant with a violation of its statutory duty under section 1 of the Structural Work Act (Ill. Rev. Stat. 1973, ch. 48, par. 60) to construct and operate the second floor deck "as to give proper and adequate protection to the life and limb of any person * * * employed or engaged thereon * * *" in that defendant failed to institute effective safety measures to prevent carpentry subcontractor's employees from falling from the upper stories of the building.

■■ The proofs showed that plaintiff was constructing an exterior wall in the prescribed manner within 4″ of the edge of the 10′ high open deck when he fell to the ground below. There was some ice on the deck that morning. To keep snow and ice off, the plaintiff and other workmen had previously laid plywood over the immediate area where plaintiff was working before he fell, and had removed as much ice as they could that morning by scraping. On this proof, we believe that plaintiff was in the exercise of ordinary care for his own safety when he fell. (We note also that freedom from contributory negligence is not an element which must

be proved for recovery under the Structural Work Act.) The proofs indicated that no safety devices were provided to prevent workmen from falling the 10′ from the deck to the frozen ground.

A certified safety expert appeared for the plaintiff. In response to a hypothetical question, he stated that a place of work such as that which defendant provided for plaintiff was not reasonably safe, and that a safety railing attached to the outer edge of the deck in one of several possible ways would have prevented the fall. He testified that such railing, which would be reusable, would cost in the neighborhood of $75, including labor. He furthermore stated that there was an established set of safety standards applicable to the construction industry, adopted by plaintiff's union. Called consensus standards, they were derived by numerous professional organizations, codified by the American Standards Institute, and incorporated virtually without change in the rules and regulations of the Department of Labor's Occupational Safety and Health Administration (OSHA). One of these rules suggests that any deck 6′ or more above the ground should be protected by a standard safety railing or its equivalent. Such a railing involves a toe board which rises 4″ above the deck, a top railing at a height of 42″ above the deck, and a third railing midway between the deck and the top railing.

One of plaintiff's co-carpenters testified that, although he had never worked on a job where railings were provided around the second floor deck, he had seen such railings in use at three specific construction projects.

The evidence presented by defendant did not refute the allegation that the work area was not a safe environment, but instead aimed to show that the work environment was customary and reasonable under the circumstances. Defense testimony revolved around two central themes: it is *not* the custom and usage of the construction trade to provide safety railings, nets, or lines for workers at the second floor deck level; and it *is* the custom of the trade to construct the external walls at the edge of the deck as described above, which practice would be made virtually impossible if the standard safety railing described in the OSHA regulations was installed on the exterior surface of the deck. Each of several contractors of long experience testified to this effect and to the fact that none had ever worked on a project where railings, nets, or safety lines were in use. These witnesses alleged that building a wall farther from the edge of the deck might be more dangerous than the customary method because the completed wall would have to be moved to the edge and "there is a chance that the bottom could kick out on you," or the strain of moving the completed wall into place could produce a "bunch of broken backs."

The witnesses who testified for defendant emphasized that the use of a safety rail with toe board would unduly slow down the progress of the

external wall construction. It should be noted that these answers were solicited in response to questions regarding the practicality of installing, on the external skin of the second floor deck, a safety rail and toe board exactly as described in the OSHA regulations. This set up, it was observed, would leave a mere 4″ work space between the toe board and the plate, in which space the carpenter would have to hammer nails through the plate into the studs.

■■ We find the theory of this defense incomplete. The OSHA regulations suggesting a particular railing were admitted only as standards of safety not required by law. The jury could use the suggestion of the regulations, along with evidence of custom and usage within the trade, to help it in determining the standard of care that should have been used. Neither plaintiff nor his safety expert asserted that a standard safety rail as described in ISHA regulations, attached directly to the external surface of the deck, was the only device and the only installation method which could have prevented the accident. Plaintiff's expert, in fact, suggested that attaching the railing to the outer skin of the second floor deck was only one of several possible ways to attach a safety rail.

■■ ■ Although there was substantial evidence that it was not the custom in the trade to employ safety nets, rails, or lines for carpenters constructing external walls at the edge of the second floor deck, such custom is not conclusive as to the required standard of care. As observed by Judge Learned Hand:

"[I]n most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission." *The T. J. Hooper*, 60 F.2d 737, 740 (2d Cir. 1932), cited with approval in *Darling v. Charleston Community Memorial Hospital*, 33 Ill. 2d 326, 331-32 (1965).

We believe, after a close review of the facts adduced at trial, that there was ample evidence to support a verdict finding defendant liable for negligence or for violation of the Structural Work Act, or both. We find nothing to indicate that the inadequate damages awarded by the jury were the result of a compromise between the issues of liability and damages. Under these circumstances, it was error for the trial court to deny plaintiff's motion for a new trial on the issue of damages only.

Reversed and remanded with instructions for a new trial on the issue of damages only.

RECHENMACHER and DIXON, JJ., concur.