(No. 33924, 33927 Cons.—

PAUL HARRIS FURNITURE COMPANY *et al.,* Appellants, *vs.* WILLIAM MORSE *et al.,* Appellees.

*Opinion filed November 26, 1956—Rehearing denied Jan. 23, 1957.*

EARL S. HODGES, of Springfield, (DUANE L. TRAYNOR, of counsel,) for appellant A. J. Walker.

HARRY I. HANNAH, and JOHN J. YELVINGTON, both of MATTOON, (JOSEPH P. SMITH, JR., of counsel,) for certain appellees, and LEFORGE, SAMUELS & MILLER, of Decatur, (CARL R. MILLER, and JERALD E. JACKSON, of counsel,) for other appellees.

Mr. JUSTICE DAILY delivered the opinion of the court:

The plaintiffs, Paul Harris Furniture Company, Helen B. Wyatt and William Wyatt, doing business under the name and style of Hotel Byers, and Singer Sewing Machine Company (hereinafter referred to respectively as Harris Furniture, Hotel Byers, and Singer,) each brought suit in the circuit court of Coles County to recover damages to their property resulting from a series of explosions and fires caused by propane gas which escaped from an underground propane gas tank located behind the City Drug Store in Mattoon, Illinois. The defendants in each of the three causes were the same and the three suits were consolidated for trial.

The essential facts are fully set forth in the opinion of the Appellate Court, reported in 7 Ill. App.2d 452. We restate them here only for the purpose of clarifying our opinion.

Broadway is one of the main east-west avenues in the business district of Mattoon. It is intersected at right angles by Sixteenth Street, which runs north and south, and, one block west of Sixteenth, by Seventeenth Street. One-half block south of Broadway is an alley which runs east and west between Seventeenth and Fifteenth streets. About seven feet under the surface of the alley is a sewer, the fall of which is toward the west from Sixteenth Street to Seventeenth Street. On the southeast corner of Broadway and Sixteenth Street is a shoe store. City Drug Store is next door to the east. About half way between Sixteenth

and Seventeenth streets on the south side of Broadway is the store owned by Harris Furniture, which extends all the way back to the alley. The first floor of the next building to the west is occupied by Singer, and the next building to the west, being at the southeast corner of Broadway and Seventeenth Street, is the Hotel Byers, which in part extends all the way back to the alley. The sewer in the alley is connected to the basements of each of plaintiffs' buildings by laterals.

On October 23, 1951, City Drug Store contracted with defendants Morse and Neff, doing business under the name and style of Automatic Heat Company (hereinafter referred to as Automatic Heat,) for the installation of certain heating equipment, together with a 500-gallon underground tank for the storage of liquid propane gas. Thereafter, sometime in November, 1951, Automatic Heat ordered from defendant Acme Butane Company, Inc. (hereinafter referred to as Acme,) such an underground storage tank to be installed on the City Drug Store premises by Acme. At that time the tank here involved was on Acme's storage lot. Prior thereto, on August 31, 1951, Acme had ordered a 500-gallon underground tank from defendant General Tank Company, a sales agency of defendant McNamar Boiler and Tank Company (hereinafter referred to as McNamar). On September 4, 1951, the tank, (later installed behind City Drug Store,) identified as tank E-6054 and manufactured by defendant McNamar, was received by Acme and placed on its storage lot. Between September 7 and 9, Acme received the Data Report covering said tank, a form required by the American Society of Mechanical Engineers Code, usually referred to as the A.S.M.E. Code, and by the rules and regulations of the State Fire Marshal. On that Data Report appeared "18. Drain connection...... (size) in," and this blank was not filled in. The tank weighed about 1600 pounds, had two openings on the top, and had one opening or drain connection in the

bottom constructed for the installation of a ¾-inch plug with screw threads on it. Before being sold by General Tank, McNamar had subjected it to a hydrostatic test in which plugs covered with a heavy paint-like compound were inserted in each opening and the tank filled with water to a pressure of 400 pounds.

When the Data Report was received by Acme, the Acme manager took it to the storage lot and checked the tank in question. He saw two openings in the top of the tank, but failed to see the drain opening in the bottom. The tank remained on Acme's lot from the day it was received on September 4, 1951, until November 26 or 27, 1951.

On November 25, 1951, Automatic Heat requested A. J. Walker, doing business under the name and style of Walker Construction Company, (hereinafter referred to as Walker,) to dig an excavation behind City Drug Store for the installation of the tank. In making such excavation, Walker's employees cut through several tile about three feet underground which ran into the sewer in the alley. Walker knew the title had been cut, but he did not repair or replace them nor did he notify anyone of the fact the tile were broken.

Acme removed the tank from its storage lot on November 26 or 27, 1951, and took it to the excavation behind the City Drug Store where it was lowered into the ground. Acme did not give the tank a protective coating before placing it in the ground, although such coating is required by the National Board of Fire Underwriters. After the tank was installed, Walker backfilled the excavation and placed a concrete protective housing over the dome of the tank.

On January 24, 1952, Acme placed 425 gallons of propane gas in the tank. On January 27, 1952, a steam-like substance was seen rising from the ground in the vicinity of the tank and there was a flash of light and fire

behind City Drug Store. About ten or fifteen minutes later, there were violent explosions in the Harris Furniture Store and the Hotel Byers and these buildings caught fire. The property of all three plaintiffs was severely damaged.

After the fires and explosions the tank was removed from the ground by Acme. There was no plug in the bottom outlet, and an expert witness testified that at the time of removal "inside the tank opening on the threads of the coupling there was paint or something." Undenied expert proof at the trial showed that the explosions and fires were caused by escaping gas from the tank which eventually flowed into the sewer and came in contact with an electric motor operating in the basement of one of the buildings, and a gas pilot light and a burning fire in the other building.

At the trial, proof of damages was made pursuant to a stipulation entered into by all of the parties, which will be set forth later herein. Pursuant to that stipulation, Harris Furniture scheduled a total loss of $67,992.19, and gave credit for $8940.34 received from Acme, leaving an uncompensated loss of $59,051.85. Hotel Byers scheduled a total loss of $111,394.18, and credited $18,391.61 received from Acme, leaving an uncompensated loss of $93,002.57. The Singer schedule shows a total loss of $8122.85, with a credit of $1611.47 received from Acme and leaving an uncompensated loss of $6511.38.

At the close of plaintiffs' case, Automatic Heat Company was dismissed on motion for directed verdict. Prior to trial, Acme made a settlement with plaintiffs for the amounts mentioned above, took a covenant not to sue, and was dismissed without prejudice. As to the remaining defendants, the jury returned guilty verdicts and awarded the following damages: Harris Furniture $8940.34, Hotel Byers $18,391.61, and Singer $1611.47, these being identical to the amounts which the respective plaintiffs received from Acme under the covenant not to sue. Thereafter the

trial court denied the motions of McNamar and General Tank for judgments notwithstanding the verdicts, granted Walker's motion for judgment notwithstanding the verdict, denied the motions of plaintiffs for judgments in their favor for the amounts of uncompensated loss shown in their schedules, and denied plaintiffs' alternative motions for a new trial solely on the issue of damages.

On appeal, the Appellate Court reversed the order denying the motions of McNamar and General Tank for judgments notwithstanding the verdicts and the judgments entered on such verdicts, reversed the order granting Walker's motion for judgment notwithstanding the verdict and the judgment entered in accordance therewith, remanded the case to the trial court with directions to enter judgment against Walker for the amount of plaintiffs' verdicts, and affirmed the order denying plaintiffs' motions for judgments notwithstanding the verdicts or, in the alternative, for a new trial solely on the issue of damages. We have granted leave to appeal both to the plaintiffs and Walker in order to further review the case.

Considering first the question of the liability of McNamar Boiler and Tank Company and its sales agency, General Tank Company, hereafter referred to together as the manufacturer, we are confronted on this appeal with the question of whether there is any competent evidence, standing alone, together with any reasonable inferences to be drawn therefrom, taken with its intendments most favorable to the plaintiffs, to support the charge that said manufacturer was negligent. If not, defendant manufacturer's motion for judgment notwithstanding the verdict should have been allowed, and the Appellate Court was correct in reversing the judgment entered on the verdict against said defendant. *Lindroth* v. *Walgreen Co.* 407 Ill. 121.

An examination of plaintiffs' complaints shows that their entire case against the manufacturer is based on the charge that said manufacturer delivered the tank to Acme

without supplying a plug for the drain hole in the bottom of the tank. All the other charges of negligence against this defendant—misrepresentation, breach of warranty, etc. —appear to us to be premised upon that contention. In our opinion, the record reveals an entire failure of proof of this essenti... allegation.

There is no direct evidence that there was no plug in the bottom drain or accompanying the tank when it was received by Acme. In attempting to so show, plaintiffs rely entirely upon circumstantial evidence that when the tank was dug up after the explosions there was no plug in the bottom drain, and upon the testimony of their witness McLean who said that he examined the tank after its removal and noticed that inside the bottom tank opening, on the threads of the coupling, "there was paint or something," and further stated, "From my examination of those threads I concluded that there had not been a plug in the tank since the tank had been painted."

The tank was sold to Acme and delivered to it at Mattoon on September 4, 1951. It was placed in Acme's storage yard across the highway from the Acme office. A few days after its delivery, the manager of Acme's Mattoon branch checked the tank. The tank remained on Acme's storage lot with other tanks for almost three months, until about November 26, 1951, when it was installed behind the City Drug Store. Under these circumstances, the fact that there was no plug in the bottom drain when the tank was removed from behind City Drug Store on January 29, 1952, is no proof that the manufacturer failed to supply a plug with the tank when it was delivered to Acme almost five months earlier. There is no evidence to support an inference that the tank remained in the same condition from September 4, 1951, until January 29, 1952. There was ample opportunity for the plug to have been lost or removed while it was standing on Acme's storage lot for almost three months. As stated in *Rotche* v. *Buick Motor*

*Co.* 358 Ill. 507, 516, where plaintiff sued the manufacturer of his automobile for injuries incurred in an accident allegedly resulting from certain parts having been left out when the automobile was assembled at defendant's factory, "The mere fact that an accident resulting in an injury to a person or in damage to property has occurred does not authorize a presumption or inference that the defendant was negligent. The burden was upon the defendant in error to prove by competent evidence, direct or circumstantial, that the plaintiff in error was guilty of negligence in the manufacture or assemblage of the automobile in question. * * * Without a proper foundation being laid for the evidence, the condition in which the car was found several weeks after the accident had no tendency to show how the parts had been assembled at the factory. Such proof even failed to establish the condition of the car when the accident occurred." Likewise, in the instant case, without proof that the condition of the tank remained unchanged from the date of its delivery to Acme until the date it was removed from the ground, or at least until the date of its installation, the absence of a plug at the time of its removal after the explosion did not tend to prove that no plug was ever furnished by the manufacturer in the first instance.

Neither does the testimony of plaintiffs' witness McLean that there was "paint or something" in the threads of the bottom drain connection tend to prove that the manufacturer failed to supply a plug with the tank. Plaintiffs claim that this testimony shows that no plug had ever been inserted in the tank after it was painted by the manufacturer. Plaintiffs, however, laid no foundation for this claim. There is no showing that if a plug had been inserted, all of the paint would have been dislodged from the threads. There is no showing that the "paint or something" was not the "paint-like" compound used on the test plugs before insertion. There is no showing that insertion of another

plug would have removed all such compound from the drain. Thus there was no basis for McLean's conclusion that there had not been a plug in the drain since the tank was painted and there was no evidence to support such an inference. We believe his opinion was based purely on guess, surmise or conjecture and therefore is no evidence at all. See: *Kanne* v. *Metropolitan Life Insurance Co.* 310 Ill. App. 524; *Buford* v. *Cleveland & Buffalo S. S. Co.* 192 F.2d 196.

Moreover, and in our minds of greater significance, even if we were to assume that no plug was ever actually inserted in the drain itself after the tank was painted by the manufacturer, this still would not support an inference that no plug was *supplied* by the manufacturer, which is what the plaintiffs charge. The undisputed evidence shows that it was common practice for plugs to be delivered with McNamar tanks, not in their respective holes, but in a box in the dome of the tanks. Acme had often received tanks with plugs so accompanying them. There is no evidence that plugs were not so delivered with the tank in question and later removed. In fact, an Acme employee testified that a plug of the size required to fit the bottom drain of this tank was found in the Acme storage room after the explosion. After a consideration of the entire record, we are convinced that there is no evidence to support plaintiffs' charge that defendant manufacturer failed to supply a plug for the bottom drain of the tank. Such alleged failure was the negligence complained of and was an essential element of plaintiffs' case. Plaintiffs misconceive their burden of proof when they argue that defendant offered no evidence to show the plug *was* shipped to Acme. The burden rested on the plaintiffs to prove the plug was *not* supplied. There being a total failure of proof of this essential element of plaintiffs' case, the Appellate Court was correct in holding that defendant manufacturer was entitled to judgment notwithstanding the verdict.

In their briefs plaintiffs place great reliance on the manufacturer's alleged omission in the Data Report concerning this tank which was sent to Acme a few days after delivery of the tank. In this regard, they argue that the manufacturer's failure to fill in the blank following the words "18. Drain connection...... (size)" constituted a representation or warranty that there was no bottom drain opening in the tank, and that since the tank did have such an opening, the manufacturer was guilty of breach of warranty or misrepresentation. Plaintiffs are rather vague as to the type of warranty which defendant is claimed to have breached. It appears that they are relying on an alleged breach of express warranty and breach of the implied warranty of fitness imposed by section 15 of the Uniform Sales Act. (Ill. Rev. Stat. 1951, chap. 121½, par. 15.) We will not attempt to point out all of the fallacies in plaintiffs' argument. One obvious flaw in their theory of express warranty is that an express warranty is one imposed by the parties to the contract and is a part of the contract of sale, and an action for breach of express warranty is an action *ex contractu.* (*Beckett* v. *F. W. Woolworth Co.* 376 Ill. 470.) Plaintiffs were not parties to the contract of sale of this tank, no express warranty was made to them, and they did not rely on any such warranty. For this reason plaintiffs have no right of action based on express warranty. As to the alleged breach of an implied warranty of fitness, it is charged that the tank was unfit for use as an underground storage tank because the manufacturer supplied no plug for its bottom drain. Having failed to prove that such a plug was not supplied, plaintiffs have no basis for their claim that the tank was unfit for its intended use.

Next we are confronted with the question of the liability of defendant Walker, the contractor employed by Automatic Heat Company to excavate the pit for the tank. Walker contends, first, that as a matter of law he cannot

be held liable in this case because he comes within the rule that after the work of an independent contractor is completed and accepted by the contractee, the contractor is not liable to third persons for damages subsequently resulting from his defective work. Plaintiffs, on the other hand, maintain that this case falls within the exceptions to the above rule.

The general rule is that where an independent contractor is employed to construct or install any given work or instrumentality, and has done the same and it has been accepted by the employer and the contractor discharged, he is no longer liable to third persons for injuries received as the result of defective construction or installation. (*Empire Laundry Machinery Co.* v. *Brady,* 164 Ill. 58.) This rule, however, is subject to certain well recognized exceptions whereby a contractor may be held liable even after acceptance of his work by the contractee (1) where the thing dealt with is imminently dangerous in kind, such as explosives, poisonous drugs, and the like, (2) where the subject matter of the contract is to be used for a particular purpose, requiring security for the protection of life, such as a scaffold, and (3) where the thing is rendered dangerous by a defect of which the constructor knows but deceitfully conceals, and which causes an accident when the thing is used for the particular purpose for which it was constructed. (*Empire Laundry Machinery Co.* v. *Brady,* 164 Ill. 58; *Colbert* v. *Holland Furnace Co.* 333 Ill. 78; *Healey* v. *Heidel,* 210 Ill. App. 387.) We are of the opinion that this case clearly comes within the first exception, if not also within the second and third.

That the storage of liquid propane gas is imminently dangerous cannot seriously be disputed. (See: *Fligelman* v. *City of Chicago,* 348 Ill. 294, where this court took judicial notice of the fact that the storage of gasoline is imminently dangerous.) Moreover, plaintiffs' evidence shows that Walker knew that the excavation was to be used for

the placing of a propane gas storage tank and knew that propane gas was highly explosive. To disassociate, as Walker would have us do, the digging of the hole from the entire installation and conclude that since the hole, in and of itself, was not imminently dangerous, the excavator was relieved of all liability, would be to sacrifice justice and common sense to meaningless technicality. In his attempt to avoid liability, said defendant even argues that a hole in the ground is not an instrumentality or thing and therefore, in digging such hole, he was not dealing with a "dangerous thing" in the terms of the first exception. We consider such strained reasoning to be without merit. The storage of gas was the dangerous thing dealt with and Walker's work was a necessary part of the installation of the tank for such storage. He, like every other person participating in that installation, was dealing with a thing imminently dangerous and thus may be held liable for damages resulting from any negligence in the performance of his work, even after its completion and acceptance.

Having established that Walker was not relieved from liability by reason of his status as an independent contractor, we further find that the evidence was sufficient to support the jury's conclusion that Walker was guilty of negligence which proximately caused or contributed to cause the plaintiffs' damages. The evidence tended to show that Walker had 20 years experience in construction work, including excavations for tanks, that Walker knew that propane gas was highly explosive, that Walker knew the excavation was to be used for the placing of a propane gas storage tank, that Walker or his agent cut tile leading from the tank pit to the sewer, that Walker saw the broken tile and knew he had cut them but did nothing to repair them or close them up and did not notify anyone of this condition, that Walker knew that the faces of the openings in the tile were cut flush with the sides of the pit, that after the tank was placed in the hole Walker filled up the

hole, sealed off the top of the tank and still told no one of the cut and open tile leading to the sewer, and that plaintiffs' properties were damaged as a result of propane gas traveling from the tank through the cut tile into the public sewer, and through the sewer to the basements of plaintiffs buildings. On this evidence the jury could reasonably conclude that Walker was negligent in failing to repair the cut tile or to notify either his employer or Acme of this condition, and that his negligence caused or contributed to cause plaintiffs' damages. Although Walker might not have foreseen the exact consequences of his conduct, a jury could reasonably conclude that as a reasonable man he should have foreseen that some harm would result. *City of Dixon* v. *Scott*, 181 Ill. 116.

Defendant Walker errs when he argues that the Appellate Court set an improper standard of care. It was the jury, not the court, who set the standard of care and decided that a reasonable man, guided by the ordinary considerations which regulate the conduct of human affairs, would not have acted as Walker did under the same circumstances. The questions of negligence and proximate cause are ordinarily questions of fact for the jury to decide. (*Ney* v. *Yellow Cab Co.* 2 Ill.2d 74, 84.) Thus it is said in *Tennant* v. *Peoria & Pekin Union Railway Co.* 321 U.S. 29, at page 35, 88 L. ed. 520, at page 525: "The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. * * * That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh

the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." Measured by this precept it is our opinion that the conclusion reached by the jury in the instant case was justified by the evidence.

Neither can Walker excuse his own negligence on the theory that someone else was negligent. As was said in *Consolidated Ice Machine Co.* v. *Keifer,* 134 Ill. 481, 493, "where the negligence of two or more persons directly concurs to produce the injury, although one may have undertaken one part and another another part, and the negligence occurs in the performance of each of the several parts of the work which directly contributes to produce the injury, all will be jointly liable."

Considering the record as a whole, it is our opinion that the evidence sufficiently supports the jury's conclusion that Walker was guilty of negligence which contributed, in whole or in part, to cause plaintiffs' damages. Therefore the action of the trial court in granting Walker's motion for judgment notwithstanding the verdict was erroneous and the Appellate Court was correct in reversing such judgment.

Having decided that the verdict of the jury finding Walker guilty should be permitted to stand, we must further consider whether plaintiffs' motions for judgments notwithstanding the verdicts or, in the alternative, their motions for a new trial on the sole question of damages, should have been granted. In this regard, plaintiffs argue first that the trial court should have entered judgment in the amounts proved by them pursuant to a stipulation of the parties instead of in the smaller amounts returned by the jury. They insist that the stipulation constituted a binding agreement between the parties as to the *amount* of damages, in the nature of a special verdict, and thus requiring the court to enter judgment for the full amount

of the damages set forth in plaintiffs' schedules. This contention cannot be sustained. A mere reading of the stipulation itself and the colloquy between court and counsel at the time the stipulation was entered into amply refutes plaintiffs' argument. Said stipulation reads, in part, as follows:

"The defendants, reserving all questions of liability and any other question in regard to involvement in this case, and purely as a means of saving time, hereby offer to stipulate to waive the laying of all foundation with regard to payment of the items of damages contended by the plaintiffs and consent to raise no question about the usage of the schedules or summaries of damages which the plaintiffs have prepared, and agree to waive the introduction of the original books and to waive the offering into evidence of the original vouchers, the supporting invoices, * * * providing the plaintiffs reciprocally stipulate to support those schedules by at least one witness per schedule * * * and to offer no evidence regarding damages in addition to the items of damages reflected upon the schedules; * * * it being understood * * * that the defendants reserve the right to cross-examine plaintiffs' witnesses, and the defendants reserve all questions with reference to the measure of damages."

It is apparent from its context that the above stipulation related solely to the manner of proof, not to the amount of damages. Thus, the damages were unliquidated and defendants' cross-examination of plaintiffs' witnesses shows the amount of such damages was in dispute. Plaintiffs concede that in a case involving controverted and unliquidated damages, the parties have the right to have the jury fix the damages. We conclude, therefore, that plaintiffs' motions for judgments notwithstanding the verdicts for the full amount of the allegedly stipulated damages were properly denied.

At this point, it should also be noted that even if the amount of the damages had been stipulated in this case, plaintiffs, under the authority of *Hughes* v. *Bandy*, 404 Ill. 74, would not be entitled to a judgment notwithstanding the verdict for a larger amount than the verdict because such judgment would, in effect, deprive the defendant of his right of trial by jury.

Finally, we come to the question of whether plaintiffs' alternative motions for a new trial on the sole question of damages should have been granted. As previously stated, plaintiffs' evidence tended to show that Harris Furniture had suffered an uncompensated loss of $59,051.85, Hotel Byers an uncompensated loss of $93,002.57, and Singer an uncompensated loss of $6511.38. The jury, however, returned a verdict of $8940.34 for Harris, $18,391.61 for Hotel Byers, and $1611.47 for Singer, these being the exact amounts paid to the respective plaintiffs by Acme under the covenant not to sue. Without further analyzing the evidence as to damages, it is sufficient to say that the amounts awarded plaintiffs under these verdicts are clearly against the manifest weight of the evidence, bear no relation to the damages shown by plaintiffs' evidence, are clearly inadequate, and obviously resulted from some misunderstanding or confusion on the part of the jury. The troublesome question is whether the plaintiffs were entitled to a new trial on the sole issue of damages without also being compelled to retry the question of liability. The Appellate Court held that the refusal of such a limited new trial was proper, and that since plaintiffs had not moved for a new trial on all issues, they were precluded from obtaining any relief as to the amounts of the verdicts.

The question of whether a new trial granted on the ground of inadequacy of damages may be limited to the issue of damages only has never before been squarely presented to this court. We find, however, that in other jurisdictions where this question has been raised it is generally recognized that in actions for damages due to negligence a court does have the power in a proper case to set aside an inadequate verdict and to limit a new trial to the issues of damages alone. (*Tumelty* v. *Peerless Stages,* 96 Cal. App. 530 (power of trial court) : *Taylor* v. *Pole,* 16 Cal.2d 668 (power of appellate court) ; *Hohmann* v. *Jones,* 146 Kan. 578 (power of trial court) ; *Barry* v. *Keeler,* 322 Mass.

114 (power of trial court); *Littman* v. *Goldfleis,* 130 N.J.L. 384 (power of trial court); *Daanen* v. *MacDonold,* 254 Wis. 440 (power of trial court); and see Annotation, 29 A.L.R.2d 1199.) We also find that here in Illinois, in accordance with the weight of authority throughout the United States, our appellate courts have recognized that when remanding a cause for a new trial on the ground of inadequacy or excessiveness of damages, an appellate court may limit such new trial to the issue of damages only. *Olson* v. *Chicago Transit Authority,* 346 Ill. App. 47, aff'd 1 Ill.2d 83, on other grounds; *Springer* v. *Yellow Cab Co.* 328 Ill. App. 354; *Tennes* v. *Tennes,* 320 Ill. App. 19.

While not controlling here, we find the reasoning of the above authorities to be persuasive, and therefore hold that either a trial or an appellate court may set aside an inadequate verdict and order a new trial solely on the issue of damages in a proper case, that is, in a case where the damage issue is so separable and distinct from the issue of liability that a trial of it alone may be had without injustice. (*Gasoline Products Co.* v. *Champlain Refining Co.* 283 U.S. 494, 75 L. ed. 1188.) We believe that in the instant case, since the verdict against Walker on the question of liability was amply supported by the evidence, the question of the amount of damages is separable and distinct from the issue of liability, and that the error which resulted in inadequate damages did not affect the issue of liability.

It appears that the Appellate Court's holding that a new trial solely on the question of damages would be improper in this case was based largely upon its assumption that the verdict against Walker was "obviously a compromise." We agree with the Appellate Court that a court is not justified in ordering a new trial on the issue of damages alone where it appears that the damages awarded by the jury were the result of a compromise on the question of liability. In this case, however, there is nothing

to indicate such a compromise, and, in fact, the record points rather to misunderstanding or confusion of the jury by the evidence of the Acme settlements. Although we regard the damages awarded as too low and against the manifest weight of the evidence, no conclusion can be drawn therefrom that the verdict was a compromise or that the jurors bargained inadequate damages for unjustified liability. For the reasons above set forth, we hold that as against defendant Walker, the plaintiffs are entitled to a new trial solely on the issue of damages.

The judgment of the Appellate Court as to McNamar Boiler and Tank Company and General Tank Company is affirmed; the judgment of the Appellate Court reversing the judgment notwithstanding the verdict entered in favor of A. J. Walker, doing business under the name and style of The Walker Construction Company, is affirmed; the order of the Appellate Court directing the trial court to enter judgment against A. J. Walker, doing business under the name and style of the Walker Construction Company for the amount of plaintiffs' verdicts is reversed; the cause is remanded to the trial court with directions to enter judgment against A. J. Walker, doing business under the name and style of The Walker Construction Company, on the verdict of guilty and to grant plaintiffs' motions for a new trial solely on the issue of damages as against A. J. Walker only.

*Affirmed in part and reversed in part
and remanded, with directions.*