MYRTLE JOHNSON, Indiv. and as Adm'r of the Estate of Dale Johnson, Deceased, Plaintiff-Appellee, *v.* EQUIPMENT SPECIALISTS, INC., *et al.*, Defendants-Appellants.—(MOORE FARM BUILDING COMPANY *et al.*, Third-Party Plaintiffs-Appellants, *v.* F. S. SERVICES, INC., Third-Party Defendant-Appellee.)

Fourth District   No. 13948

Opinion filed March 10, 1978.

TRAPP, J., dissenting.

Thomas F. Kolter, of Thomas, Mamer, Haughey & Miller, of Champaign, and Thomas R. Smith, of Acton, Acton, Meyer & Smith, of Danville, for appellants.

Vance I. Kepley and Stephen M. O'Byrne, both of Reno, O'Byrne & Kepley, of Champaign, and Joseph W. Phebus and Betsy Pendleton Wong, both of Phillips, Phebus, Tummelson & Bryan, of Urbana, for appellees.

Mr. JUSTICE CRAVEN delivered the opinion of the court:

Defendants, Moore Farm Building Company, a corporation (Moore), and Equipment Specialists, Inc., a corporation (Specialists), appeal from judgments entered on jury verdicts in the respective amounts of $100,000 for personal injury to Dale Johnson, $76,250 for the subsequent death of Dale Johnson, and $105,383 to Myrtle Johnson for expenses, loss of support and loss of consortium. They also appeal from a summary judgment entered in favor of F. S. Services, Inc. (Services), in a third-party action for indemnity.

On January 5, 1973, Dale Johnson, aged 60, was an employee of Services and had been so employed for several years. Services operated a facility for drying seed corn and seed beans. On that date Johnson was assigned to clean the system of bins employed to dry the seed and during the afternoon was found lying at the bottom of a bin with the injuries from which he subsequently died in January 1975. He did not recover sufficiently to describe what acts or events had occurred prior to his being found.

Mr. Johnson was a habitually careful, cautious, sober, and prudent person. His primary job was as a truck driver, however he performed other tasks as assigned by his employer.

The drying facility consisted of 10 bins, each 28 feet long, 16 feet wide, and 15 feet deep. On the second floor of the structure the long axis of the bins was bisected by a conveyor suspended from the roof. A cross-shuttle supported a hopper which received grain from the conveyor to empty seed through openings into the bins. The hopper had provisions for securing it with bolts. The hopper was found in the bottom of the bin next to Johnson. The configuration of the main conveyor was such that the hopper had to be moved from its normal position in order to load the two westernmost openings in the floor. Apparently, the securing bolts were removed from the hopper for this purpose. Testimony differed as to whether the hopper had to be removed completely and then reaffixed at a different location or whether the hopper could have been loosened and then moved to the new location.

Also, on the second floor of the structure were a series of 4-feet-by-8-feet trap doors or hatches. There were four of such doors to each bin, two on each side of the conveyor. The 8-feet dimension of the door coincided with the long axis of the bin. Each opening or hatch was placed along the wall of a bin so that from the scale drawings in evidence it appears that there are 8 feet of solid floor between the doors of each bin on either side of the conveyor, about 4 feet of solid floor between the outer end of the door and the outer wall, had about 4 feet of floor area in the center and of the conveyor system. The solidity and effectiveness of the doors when closed is not an issue in this case.

The hatches or openings in the bin served as a means of placing grain into the bins and of exhausting air from the bins during the process of drying. During the filling procedure, all bin doors would be closed except for the bin into which seed was being emptied. As to such bin, all four doors would be open during the filling process. During the drying process, it was necessary for the employees to get in and out of the bins at frequent intervals to obtain samples.

It was required that the area around each bin be cleaned between batches and that the whole second-floor area be cleaned at the end of each season. Each bin would be loaded some 10 times during a season. The cleaning process was accomplished by sweeping up the excess grain and included the sweeping of the ledges upon which each door or hatch rested. The employee had to sweep around the edge.

At the time of the discovery of the accident all of the doors or hatches were closed except one over the bin in which decedent was found.

Services determined to build the facility in the latter part of 1967. Specialists, who designed and built the conveyor and drying systems, was invited to be a bidder and was awarded the general contract. Specialists entered into a subcontract with Moore for the construction of the building. There was testimony that all engineering and construction drawings were to be furnished by Specialists.

The evidence showed that Specialists and Moore were not licensed architects or structural engineers. Robert Moore, president of Moore, testified that Moore had no prior experience with grain dryers, and he consulted no outside architect or engineer.

Delbert Smith, an architect and engineer, testified as an expert witness for plaintiff. American National Standards Institute is accepted by architects as standard safe construction procedures. It was Smith's opinion that the grain dryer would not comply with the standards unless it had a safety railing at the openings. The building could have been constructed with four 2' x 5' holes without impairing its function. In his opinion, the building was not safe for workmen. The preparation of drawings showing the layout of the second floor of the building was the practice of architecture; the design for structural members would be structural engineering. He testified that a person using the ordinary care of an architect or structural engineer would not have designed the dryer without guardrails. It is the architect's function to recommend inclusion of safety features whether or not the owner says that he wants them.

The bins and dryers were put into operation in September 1968, and were used continuously until the injury to Johnson in January 1973. The record does not show any other injuries from the use of the bins.

The allegations of plaintiff's complaint state a theory that the defendants negligently designed and constructed the hatch or openings

without guardrails or protective devices to prevent workmen from falling through the open doors and that they negligently designed and constructed the openings in the floor larger than necessary for the operation of grain drying. We, therefore, decide this case under the negligence theory; strict liability plays no part here.

An issue raised upon motions to dismiss and the post-trial motions and upon appeal is whether or not the allegations in the complaint and the evidence establish a duty and a breach of duty upon the part of the defendants.

■■ ■ The rule in Illinois is stated in *Paul Harris Furniture Co. v. Morse* (1956), 10 Ill. 2d 28, 139 N.E.2d 275:

> "The general rule is that where an independent contractor is employed to construct or install any given work or instrumentality, and has done the same and it has been accepted by the employer and the contractor discharged, he is no longer liable to third persons for injuries received as the result of defective construction in installation. (*Empire Laundry Machinery Co. v. Brady*, 164 Ill. 58.) This rule, however, is subject to certain well recognized exceptions whereby a contractor may be held liable even after acceptance of his work by the contractee (1) where the thing dealt with is imminently dangerous in kind, such as explosive, poisonous drugs, and the like, (2) where the subject matter of the contract is to be used for a particular purpose, requiring security for the protection of life, such as a scaffold, and (3) where the thing is rendered dangerous by a defect of which the constructor knows but deceitfully conceals, and which causes an accident when the thing is used for the particular purpose for which it was constructed." 10 Ill. 2d 28, 40, 139 N.E.2d 275, 282.

■■ The rule is as applicable to one who designs as it is to one who constructs. (*Laukkanen v. Jewel Tea Co.*, (1966), 78 Ill. App. 2d 153, 222 N.E.2d 584.) The rule is not clear on its face and has been said to have been swallowed by its exceptions. In the instant case we would be justified in holding that the first exception is applicable. Oversized floor openings designed and constructed without guardrails do not appear at first blush to fit the phrase "imminently dangerous in kind, such as explosives, poisonous drugs, and the like." However, long ago this venerable phrase was construed far more broadly than any lay dictionary would reveal. In *Rotche v. Buick Motor Co.* (1934), 358 Ill. 507, 193 N.E. 529, the Illinois Supreme Court adopted the holding of, and quoted the following from, *MacPherson v. Buick Motor Co.* (1916), 217 N.Y. 382, 111 N.E. 1050:

> " ' If the nature of a thing is such that it is reasonably certain to place life and limb in peril when negligently made, it is then a thing

of danger. Its nature gives warning of the consequences to be expected. If to the element of danger there is added knowledge that the thing will be used by persons other than the purchaser, and used without new tests, then, irrespective of contract, the manufacturer of this thing of danger is under a duty to make it carefully.' " 358 Ill. 507, 514.

The rules of the Restatement (Second) of Torts (1965), have found favor in the Illinois Supreme Court. (See *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182 (section 405A); *Sparling v. Peabody Coal Co.* (1974), 59 Ill. 2d 491, 322 N.E.2d 5 (sections 352 and 353).) We are confident that were this case now before the supreme court, it would adopt Restatement (Second) of Torts (1965), section 385, as the applicable law: "One who on behalf of the possessor of land erects a structure or creates any other condition thereon is subject to liability to others upon or outside of the land for physical harm caused to them by the dangerous character of the structure or condition after his work has been accepted by the possessor, under the same rules as those determining the liability of one who as manufacturer or independent contractor makes a chattel for the use of others."

Several jurisdictions have adopted section 385, or a similar rule. (*Montijo v. Swift* (1963), 219 Cal. App. 2d 351, 33 Cal. Rptr. 133; *Hunter v. Quality Homes* (1949), 45 Del. 100, 68 A.2d 620; *Hanna v. Fletcher* (D.C. Cir. 1956), 231 F. 2d 469, 58 A.L.R. 2d 847, *cert. denied* (1956), 351 U.S. 989, 100 L. Ed. 1501, 76 S. Ct. 1051; *Thompson v. Burke Engineering Sales Co.* (1960), 252 Iowa 146, 106 N.W.2d 351; *Russell v. Community Hospital Association, Inc.* (1967), 199 Kan. 251, 428 P.2d 783; *Saylor v. Hall* (Ky. 1973), 497 S.W.2d 218; *Marine Insurance Co. v. Strecker* (1957), 234 La. 522, 100 So.2d 493; *McDonough v. Whalen* (1974), 365 Mass. 506, 313 N.E.2d 435; *Kapalczynski v. Globe Construction Co.* (1969), 19 Mich. App. 396, 172 N.W.2d 852; *Russell v. Arthur Whitcomb, Inc.* (1956), 100 N.H. 171, 121 A.2d 781; *Totten v. Gruzen* (1968), 52 N.J. 202, 245 A.2d 1; *Baker v. Fryar* (1966), 77 N.M. 257, 421 P.2d 784; *Inman v. Binghamton Housing Authority* (1957), 3 N.Y.2d 137, 164 N.Y.S.2d 699, 143 N.E.2d 895; *Krisovich v. John Booth, Inc.* (1956), 181 Pa. Super. 5, 121 A.2d 890; *Leigh v. Wadsworth* (Okla. 1961), 361 P. 2d 849; *Pastorelli v. Associated Engineers, Inc.* (D.R.I. 1959), 176 F. Supp. 159 (applying Rhode Island law); *Johnson v. Oman Construction Co.* (Tenn. 1975), 519 S.W.2d 782; and *Strakos v. Gehring* (Tex. 1962), 360 S.W.2d 787.) However, a split of authority exists as to whether liability exists for patent defects, or only for latent ones.

In *Inman,* the complaint was held to be fatally defective because it contained no allegation of a latent defect or concealed danger. *Inman* cites to section 385 and notes there there is no reason to distinguish

between the liability of one who supplies a chattel and one who erects a structure. Accord, *DiPerna v. Roman Catholic Diocese* (1968), 30 App. Div. 2d 249, 292 N.Y. Supp.2d 177; *Russell*.

While New York addressed the problem in terms of duty, several other jurisdictions use a proximate cause analysis. *Totten* dealt with a patent defect and rejected *Inman* and the requirement for a latent defect. There the infant plaintiff was burned in 1961 as a result of contact with hot pipes leading to a radiator which were exposed and uncovered. The incident occurred in an apartment in public housing that had been built in the late 1940's. Defendants were the architects, the general contractor, and the heating contractor. The trial court dismissed the complaint, relying on the rule that an independent contractor is not liable for injuries to third persons after the employer has accepted the work.

In *Totten*, the New Jersey Supreme Court first adopted the rule that architects and contractors are not to be relieved of liability merely because the work has been completed and accepted by the owner. Then, the court turned to the patent-latent defect problem:

> "In any event, the dichotomy appears to rest on the notion that if the design or workmanship is so obviously bad and dangerous, the owner would or should do something promptly to correct it and, if he does not, liability for injury rests with him alone. The idea is somewhat strange and illogical in thus terminating the possibility of liability of the party basically at fault. Perhaps it would be sounder to say that the subsequent inaction of the owner simply adds him as another possible tortfeasor.

> * * *

> [T]he obviousness of a danger does not necessarily preclude a jury finding of unreasonable risk and negligence; however, it will so preclude if the obviousness to the claimant justifies the conclusion that the condition is not unreasonably dangerous; otherwise it is simply a factor to consider on the issue of negligence of the contractor." 52 N.J. 202, 211, 245 A.2d 1, 6.

In *Baker*, New Mexico adopted the restatement view. New Mexico had previously followed *Russell* and required a latent defect. But in *Baker*, the court rejected the latent defect requirement and adopted the analysis of Restatement (Second) of Torts (1965), section 452, which provides for termination of liability by a supervening cause. *Baker* is in accord with *Ray v. Cock Robin, Inc.* (1974), 57 Ill. 2d 19, 310 N.E.2d 9, holding that an independent or intervening cause that is foreseeable or probable will not break the causal chain. This court is not able to say, as a matter of law, that the failure of Services to take corrective action was unforeseeable.

The reasoning of the *Totten* case is persuasive. When a building is

designed and built, it is foreseeable that it will not be changed in a material manner for some time to come. It is foreseeable that contractees will not install safety features that designers have omitted. An underlying purpose of tort law is to provide for public safety through deterence of negligent designers and builders. This purpose cannot be accomplished if these persons are insulated from liability simply by the act of delivery to the contractee. The purpose can be accomplished if the issue is treated as one of proximate cause. At the same time, designers and builders will be free of liability where a jury finds that the contractee's or plaintiff's negligence, and not they, caused the injury.

■■ The record facts are that Johnson did not recover from his injuries and could not relate the circumstances of his accident. There were no witnesses. Johnson was a man of careful habits. We cannot speculate on its verdict, but it may be that the jury believed the testimony of careful habit. If so, it may have believed that Johnson had an encounter with the grain hopper, was thrown off balance, and fell into an opening that should have been guarded. There was some evidence that the hopper bolts were loosened, and that Johnson didn't know this. From this, a presumption arises that the deceased was in the exercise of due care at the time of the accident. If the case is not susceptible of any higher proof, this is sufficient to send the case to the jury. (*Hardware State Bank v. Cotner* (1973), 55 Ill. 2d 240, 302 N.E.2d 257; *Casey v. Chicago Rys. Co.* (1915), 269 Ill. 386, 109 N.E. 984.) The defendants have not pointed out any "higher proofs." Furthermore, the trial judge correctly instructed the jury on the issue of contributory negligence and it was proper for the jury to find for Johnson on that issue.

In this regard see *Ziraldo v. W. J. Lynch Co.* (1936), 365 Ill. 197, 6 N.E.2d 125: A workman at a construction site was struck by a descending elevator; there was no guard across the shaft opening; he knew of the shaft; but he was busily working and moved inadvertently to harm.

The assumption of risk doctrine plays no part here because defendants did not plead it.

The defendants sued Services for indemnity, and the trial court granted summary judgment for Services. The recent opinion of the Illinois Supreme Court in the case of *Skinner v. Reed-Prentice Division Package Machine Co.* (1977), 70 Ill. 2d 1, 374 N.E.2d 437, as originally filed, would have commanded a different result on the summary judgment motion. The supreme court has, by a supplemental opinion upon denial of rehearing, specifically ordered that the decision in *Skinner* be given prospective application only and that it relate only to occurrences on and after March 1, 1978. In view of our conclusion in this case, that the defendant's conduct constituted negligence of a quality that can be

described as active, there is no possibility of indemnity under the rules of contribution that relate to this occurrence. The trial court's grant of the motion for summary judgment was correct.

■■ Defendants claim error because plaintiff's counsel stated in the presence of the jury: "Well, he's [a witness, Z. Charles Jones] been in your [defendant's] hip pocket and I have seen him twice and he gives me a different answer * * *." The trial judge stated that he did not hear the comment and didn't know if the jury did. It appears that the witness was impeached by prior inconsistent statements. Accordingly, we find the comment to be harmless in the context of the case, even though we strongly disapprove of such action by counsel.

During the examination of Walter Monti, an employee of Services, counsel for plaintiff asked, "Isn't it a fact, Mr. Monti, that all of the operations that have taken place in that dryer in the last several years have been done with a guard around the opening, such as that shown by plaintiff's exhibit No. 45?" Plaintiff contends that the record does not accurately state the question; he asked if the operations could have been done with a guard. Upon defendant's objection to the question, the tape recording was played back several times and it revealed that someone had coughed at the point where plaintiff's counsel said that he said "could." The trial court ruled that there was not sufficient prejudice to defendants to require a mistrial. The question was rephrased to ask whether it was feasible to construct a guard and defendants claim error on this. It is clear that the initial form of the question, even if asked as defendants contend, was not sufficiently prejudicial as to warrant a new trial. The question was asked, but was not answered and no relief will be granted on this point.

■■ It is alleged that error occurred during closing argument by plaintiff. No objection was made at that time and, therefore, the issue is waived.

■■ The jury was instructed that if a statutory violation were found the fact could be considered in determining whether a party was negligent in designing or constructing the grain dryer. The statutes involved are the Illinois Architectural Act (Ill. Rev. Stat. 1967, ch. 10½, par. 1 *et seq.*) and the Illinois Structural Engineering Act (Ill. Rev. Stat. 1967, ch. 131½, par. 1 *et seq.*). The purpose of the Illinois Architectural Act is the protection of the public against incompetent architects and the harm that might result by reason of dangerous and improperly constructed buildings. (See *Gastaldi v. Reutermann* (1952), 345 Ill. App. 510, 104 N.E.2d 115.) A like purpose may be inferred for the Illinois Structural Engineering Act. Nonetheless, it cannot be said that the failure to qualify or register under either act was the proximate cause of the death in this case. Disregarding for the moment evidence to the contrary, it may be that the structure in

question was designed and constructed as it would have been had it been done by a registered architect or engineer. Thus, the failure to register played no causal role. However, in the instant case there was considerable evidence of negligence, and reversal is not warranted because the jury was instructed that it could consider this extra portion of negligence. Viewing this record in its entirety, it must be said that the error did not affect the outcome below. *Lawson v. G. D. Searle & Co.* (1976), 64 Ill. 2d 543, 356 N.E.2d 779.

Moore complains because one of its instructions was refused:

> "Under Illinois law an employee cannot sue his employer directly for injuries or deaths sustained in the course and scope of his employment." (Not in IPI.)

Moore cites no authority. As plaintiff notes, the defendants brought the employer into the action and summary judgment was rendered for the employer at the close of all the evidence. It is difficult to see any prejudice to Moore in refusal of this instruction.

■■ Moore also complains that it was error to give IPI Civil No. 2.07 (2d ed. 1971) instructing that it is proper to consider the number of witnesses testifying on one side or the other. Use of this instruction was recently sanctioned by the Illinois Supreme Court (*Hardware State Bank v. Cotner* (1973), 55 Ill. 2d 240, 302 N.E.2d 257), and we find no error.

Defendants also find error in an instruction that would allow the jury to find that defendants assumed to act as architects and structural engineers, and allowed unqualified persons to prepare the plans. There is ample evidence that Moore assumed to act as an architect and structural engineer. It is less clear that Specialists did so, but it is clear that Specialists contracted to be responsible for design work. The issue presented a jury question, and was resolved against defendants.

Specialists complains that certain instructions call for a finding of pecuniary loss to the decedent, his widow and children. Specialists claims the instructions should not have had reference to the decedent's children as they were emancipated. The jury award was $76,250 for wrongful death. There is an evidentiary basis for the children's loss in that the decedent provided some assistance to them as needed. There is a presumption of pecuniary loss where decedent leaves lineal heirs. (*Ferraro v. Augustine* (1964), 45 Ill. App. 2d 295, 196 N.E.2d 16.) In that case, an unmarried decedent left aged parents surviving; an award of $17,800 was affirmed. *Baird v. Chicago, Burlington & Quincy R.R. Co.* (1976), 63 Ill. 2d 463, 349 N.E.2d 413, allowed a recovery where the decedents were minors leaving only parents as survivors. We find no error in the award.

■■ Counsel for Moore attempted to elicit from Monti testimony to the effect that Specialists would not have paid extra for the installation of

guardrails at the time of construction. The trial court sustained objections, terming the question too speculative. The trial court was correct in ruling that it would have been too speculative to allow into evidence testimony of what might have been. Moore itself notes that it is the evidence of what the parties in fact did that is relevant, rather than what they contracted to do; we might add that evidence of what the parties might not have contracted to do is also irrelevant.

■■ Specialists complains because its witness, Dailey, was precluded from testifying as to the existence of local building codes. Plaintiff's counsel objected to a question, and the trial court sustained the objection. Specialists did not ask the basis of the trial court's ruling, and any basis that may be hypothesized can be used to sustain it. Assuming evidence most favorable to the defendant, the fact that a building code did not apply to the area in question would not be evidence from which the inference could be drawn that no standard of care applied to the area. We find no error.

■■ The same witness was precluded from expressing an opinion as to who was responsible for installing guardrails. The bases for the trial court's ruling was that since the witness was not an expert in architecture or safety, knew nothing about the operation of a grain drying facility, an opinion would involve legal interpretation of a contract. The ruling was correct. The witness was asked to testify in response to a hypothetical question. His qualifications had not been shown to the satisfaction of the trial court. Whether a witness is qualified as an expert is a question to be determined by the trial court and is within the court's discretion.

■■ Specialists argues that because this was a negligence action, and not a contract action, the contract between Services and Specialists should not have been admitted in evidence; it is also pointed out that plaintiff was not a party to the contract. The contract was relevant on the issue of duty, even though plaintiff was not a party to it. *Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316, 211 N.E.2d 247.

The judgment entered for plaintiff against Moore and Specialists is affirmed; the judgment entered for Services against Moore and Specialists is also affirmed.

Judgments affirmed.

REARDON, P. J., concurs.

Mr. JUSTICE TRAPP, dissenting:
Upon the law and evidence in this case, the judgment entered in the trial court should be reversed.

The principal opinion quotes section 385 of the Restatement (Second) of Torts. It does not, however, note the comment *c* to such section which enlarges and explains the application of the rule stated. That comment provides:

"A manufacturer of a chattel who puts it upon the market knowing it to be dangerous and having no reason to expect that those who use it *will realize its actual condition is liable* for physical harm caused by its use (§394). As the liability of a servant or an independent contractor who erects a structure upon land or otherwise changes its physical condition is determined by the same rules as those which determine the liability of a manufacturer of a chattel, it follows that such a servant or contractor who turns over the land with knowledge that his work has made it dangerous in a manner *unlikely to be discovered by the possessor*—is subject to liability both to the possessor, and to those who come upon the land with the consent of the possessor or who are likely to be in its vicinity." (Emphasis supplied.)

As section 385 is correlated with the liability of the manufacturer of chattels (Restatement (Second) Torts §402A (1965)), we note a similar statement of the nature of the liability in comment *n* that if the user discovers the defect but proceeds to use the product he is barred from recovery for injuries sustained.

Comment *g* of section 402A states that the manufacturer is liable if he delivered the chattel "in a condition contemplated by the ultimate consumer which will be unreasonably dangerous to him." Unreasonably dangerous is defined as "dangerous to an extent beyond that which would be contemplated by the ordinary consumer."

The series of doors, each 4 by 8 feet in dimension situated over the several bins cannot rationally be deemed to be unlikely to be discovered by the defendant, or dangerous to an extent beyond that contemplated by an ordinary user. Such doors had existed and been used for some 4 years prior to the date of the injury incurred here.

Examination of the cases cited in the principal opinion discloses that most foreign jurisdictions and apparently all Illinois cases have recognized and approved the conclusion that an individual cannot claim a breach of duty where the condition alleged to be dangerous is, in fact, open, apparent, and obvious.

In the cited *McDonough v. Whalen* (1974), 365 Mass. 506, 313 N.E.2d 435, the purchaser of a house sued the designer and the builder of a defective septic tank in an action in tort. Likening the action to that against the manufacturer of a chattel, the court said:

"* * * and the ordinary person buying such a house is in no better

position *to discover hidden dangers* caused by the negligent construction than is the purchaser of a defective bottle of perfume, *Carter v. Yardley & Co., Ltd. supra.*" (Emphasis supplied.)

In the cited *Hanna v. Fletcher* (D.C. Cir. 1956), 231 F.2d 469, 58 A.L.R.2d 847, the plaintiff tenants sued for the negligent repair of stair railings. The court referred to section 385 of the Restatement of Torts. Noting the defense of contributory negligence, the court stated:

"[T]he shortcomings of its repairs created an inherently dangerous condition *which was not apparent to the untrained* and which imperiled the safety of those having occasion to use the railing in reliance upon its strength and security. \* \* \*." (Emphasis supplied.)

In *Paul Harris Furniture Co. v. Morse* (1956), 10 Ill. 2d 28, 139 N.E.2d 275, the contractor excavated a buried tank for storage of propane gas. During the excavation defendant broke several sewer lines which were never repaired nor reported and the tank was improperly placed with the result that propane gas escaped and entered certain buildings through the sewer lines and an explosion and fire ensued. The facts disclosed a dangerous defect known to the contractor but concealed, which was the proximate cause of the injury. The opinion cites as authority *Laukkanen v. Jewel Tea Co.* (1966), 78 Ill. App. 2d 153, 222 N.E.2d 584. In that complaint it was specifically alleged that the defects in the design and construction of a pylon attached to a store building were not "capable of discovery by the public." In the cited *Inman v. Binghamton Housing Authority* (1957), 3 N.Y.2d 137, 164 N.Y.S.2d 699, 143 N.E.2d 895, upon a certified question the court ordered that the defendant contractor and architect be dismissed from the cause determining that the duties of the latter was to make the structure free from latent defects or concealed dangers. Such opinion was written with specific consideration and reference to section 385 of the Restatement (Second) of Torts (1965), and *McPherson v. Buick Motor Co.* (1916), 217 N.Y. 382, 111 N.E. 1050. A similar determination was reached in *DiPerna v. Roman Catholic Diocese* (1968), 30 App. Div. 2d 249, 292 N.Y.S.2d 177, where an infant was injured when pushed against a metal rail protruding from school bleachers. The complaint charged negligence in design and installation. The court held that the complaint should be dismissed for failure to allege a dangerous defect that was hidden or concealed.

In *Totten v. Gruzen* (1968), 52 N.J. 202, 245 A.2d 1, the opinion discussed the liability of an independent contractor whose work had been accepted and concluded that a finding of negligence will be precluded "if the obviousness to the claimant justified the conclusion that the condition is not unreasonably dangerous." In that instance an infant was burned on

an exposed system of hot water pipes attached to a radiator. Such condition would not be apparent to an infant.

In addition to *Paul Harris Furniture Co.*, plaintiffs have cited *Colbert v. Holland Furnace Co.* (1928), 333 Ill. 78, 164 N.E. 162, *Rodgers v. Meyers & Smith, Inc.* (1965), 57 Ill. App. 2d 200, 206 N.E.2d 845, *McDonald v. Frontier Lanes, Inc.* (1971), 1 Ill. App. 3d 345, 272 N.E.2d 369, and *Kahn v. James Burton Co.* (1955), 5 Ill. 2d 614, 126 N.E.2d 836.

In *Colbert,* a cold air register which was insecurely set in the floor collapsed. Although the work had been accepted by the owner, the contractor was held to be liable for the reason that the defect or condition was hidden from ordinary observation and the owner was not chargeable with knowledge of the defect. In *Rodgers,* the contractor reset a sewer cover which did not fit a manhole with the result that the cover tilted when the plaintiff stepped upon it. As defendant admitted, the characteristic of the cover was that the condition that caused it to tilt was unobservable to the eye of a person walking on the premises. *McDonald* does not concern the duty of an independent contractor, but rather the liability of a utility company installing its own pipe upon city property. The *Kahn* opinion is within the framework of a nuisance attractive to children. There was, however, a factor of hidden defect in the circumstance that heavier pieces of lumber were placed upon the top of the pile creating a latent instability.

This record clearly shows that the conditions resulting from the design and construction were obvious and clearly apparent to any person who had occasion to be on the premises when the doors were open. Upon such authority the evidence in this record does not disclose that the defendant owed or breached a duty to the plaintiffs, and the judgment should be reversed.

I would further note that the trial court erred in giving plaintiff's Instruction No. 25, stating that the jury could find defendants negligent if they believed that defendants practiced as an architect without a certificate of registration in violation of the Illinois Architectural Act (Ill. Rev. Stat. 1973, ch. 10½, par. 1 *et seq.*). Appropriate objections were made that any drawings by defendants were for their own use. The statute expressly provides (ch. 10½, par. 4), that nothing in the Act prevents persons, mechanics, or builders from making plans, specifications for or supervising the erection of buildings for their own use. In *People v. Lower* (1911), 251 Ill. 527, 96 N.E. 346, the court discussed the issue of the constitutionality of the statute noting that it defined the persons who shall be regarded as architects. The opinion states:

> "It provides that any person who shall be engaged in the planning or supervision of the erection, enlargment, or alteration of

buildings for others and to be constructed by other persons than himself shall be regarded as an architect; but nothing contained in the act shall be construed to prevent any person, mechanic or builder from making plans and specifications for or supervising the erection, enlargement or alteration of any building that is to be constructed by himself or his employees. * * * [B]ut a builder is one whose occupation is to build or erect buildings and structures, and he is not in the same class as an architect, who makes plans and specifications for others. * * * Any person erecting a building may employ an architect if he sees fit or make his own plans and specifications, and he does not become an architect by planning the building which he erects." (251 Ill. 527, 530-31, 96 N.E. 346, 347.)

The instruction misstates the law. It is the duty of the trial judge to determine the meaning of the statute. The instruction is particularly prejudicial in the light of the fact that the principle of the argument of the plaintiff is directed to the design of the system of trap doors and the instruction specifically applies the statute to defendants' construction of a grain bin. It substantially directs a verdict.

Similar error arises in the giving of plaintiff's Instruction No. 26, that the jury could find defendants negligent if they found that defendants practiced structural engineering without a certificate of registration in violation of the Illinois Structural Engineering Act (Ill. Rev. Stat. 1973, ch. 131½, par. 1 et seq.). The defendants made appropriate objections that they did not come within the statute in the construction of the building. We note initially that the pleadings do not allege, and the evidence does not suggest, that there was any structural fault or failure in the grain bins which were the proximate cause of the injury. Section 3(c) expressly exempts from the requirements of a certificate any person, mechanic, or builder making plans or specifications for the construction of a building which is to be constructed by himself or his employes. The instruction was highly prejudicial in that in the form given it would require a structural engineer for the design or construction of a grain dryer. The instruction given misstated the law and had the effect of making defendants liable if they constructed a grain dryer without having a certificate of registration.

In the context of the instruction alone, the judgment should be reversed and the cause remanded for a new trial.