DEBBIE TOMASKOVIC ECKDAHL, Plaintiff-Appellant, *v.* LEASE-A-PLANE INTERNATIONAL LICENSING CORPORATION *et al.*, Defendants-Appellees.

First District (2nd Division)  No. 77-1441

Opinion filed February 27, 1979.

Marshall Teichner, of Chicago (Philip J. Rock, of counsel), for appellant.

Mark C. Fedota and Michael L. McCluggage, both of Chicago (Wildman, Harrold, Allen & Dixon, of counsel), for appellees.

Mr. JUSTICE DOWNING delivered the opinion of the court:

In this personal injury action, a jury awarded plaintiff, Debbie Tomaskovic Eckdahl, $46,800 in damages for injuries she sustained in an automobile chain collision. Finding this award inadequate, plaintiff filed a post-trial motion seeking a new trial on the issue of damages only. The trial court denied the motion.

Plaintiff appeals contending (1) the verdict was against the manifest weight of the evidence, (2) was so inadequate as to constitute a compromise verdict, and (3) a new trial on the issue of damages only should have been granted.

The accident occurred on June 26, 1971, on the Kennedy Expressway in Chicago. Defendant Burton J. Greenfield was driving an automobile as an employee of defendant Lease-A-Plane International Licensing Corporation (Lease-A-Plane). Greenfield, seeing vehicles stopped in front of him, applied his brakes, which locked and caused his automobile to skid into the rear of an automobile driven by Rudolph Romani. The impact forced Romani's automobile into the rear of plaintiff's automobile which was stopped in front of him.

Plaintiff filed a personal injury complaint against Greenfield, Lease-A-Plane, and Romani seeking $250,000 in damages. Romani's motion for summary judgment as to his liability was granted by the trial court.

The case proceeded to trial against defendants Greenfield and Lease-A-Plane. At the close of all the evidence, the trial court granted plaintiff's motion for a directed verdict against defendants on the issue of liability. Only the issue of damages was submitted for the jury's determination. The following evidence relevant to the issue of damages was adduced at trial.

Plaintiff testified that on the day of the accident she was in good physical condition. However, plaintiff testified to her involvement in a prior automobile accident in November 1969. As a result of the 1969 accident, plaintiff sustained neck injuries, was hospitalized for 10 days, received 16 days of physical therapy, was off work for one month, and

was under a doctor's care until April 1970. On cross-examination, plaintiff said it could have been four or five months that she did not work. At the time of the 1971 accident, plaintiff stated that her neck still bothered her, especially in cold or rainy weather.

Plaintiff testified that in the instant occurrence, her automobile was struck from behind, the impact of which threw her forward, her head cracking the windshield, and then threw her backward. She stated that she was "shook up but did not feel hurt" until later that day when she went to a hospital emergency room complaining of a headache, dizziness, and nausea. Two days later she was hospitalized for three days, given medication, heat massages, and traction for her neck. She continued under a doctor's care until August 1971.

At the time of the accident, plaintiff worked part-time and was a part-time night student working toward a masters degree in clinical psychology. She had worn glasses for reading since the age of 15. About three weeks prior to the accident, plaintiff saw Dr. Lockhardt, an optometrist, complaining of reading problems. About three weeks after the accident, having trouble seeing and not able to read at all, she went back to Dr. Lockhardt. She saw him two or three times, resulting in two changes in her lens prescription.

According to plaintiff, her sight grew progressively worse, she could not drive at night, and it seemed as though she was looking "through a tunnel." She went to an ophthalmologist, Dr. Merz, about four months after the accident. On cross-examination, plaintiff said it could have been a year after the accident before she saw Merz for the first time. Dr. Merz changed her lens prescription, tested her peripheral vision, and sent her to Dr. North who prescribed soft contact lenses. Plaintiff testified the contacts did not solve her problem. Plaintiff also testified to seeing Dr. Speigel, a neurosurgeon about four or five months after the accident; however, on cross-examination, plaintiff admitted it was about 13 months after the accident. Plaintiff stated that Speigel told her he could not do anything for her condition and that she should see a neurologist every two months.

Because of headaches, plaintiff said she did not return to work until about three months after the accident. However, she stated that she returned to school about one week after the accident and finished the summer school session. She resumed classes in the fall of 1971, but quit sometime in 1972 on account of headaches and reading problems.

Plaintiff testified that, at the time of trial, she had headaches, dizziness, and nausea at least three times a week; that her mother had to help her with the housework and her two children; that she could not participate in her usual sport activities; that her eyesight was worse; that

she could not watch television longer than one hour; that her reading was limited; that she could only drive when it was light outside; and that she could not see out of the corners of her eyes.

Dr. Merz, an opthalmologist, testified that he first saw plaintiff in July 1972, again in August and September 1972, and once in May 1976. Plaintiff told Dr. Merz of the 1971 accident and her subsequent treatment, but did not tell him of the 1969 accident nor that she went to an optometrist three weeks before the accident complaining of reading difficulties. She told him she had her glasses changed three times in one year, and that she was seeing Dr. Speigel with neurological problems.

Dr. Merz testified that he performed vision tests on the plaintiff which involved the moving of a target in and out on a chart in order to determine whether the patient had an impairment in her field of vision. Plaintiff told Dr. Merz that she could not see parts of the chart with either eye. Dr. Merz concluded that plaintiff had blind spots in both eyes and the problem was behind the eyes in the chiasm. The chiasm, he explained, is located in the brain and is where the optic nerves cross. He stated that such a disorder requires the care of a neurosurgeon and sent her back to Dr. Speigel.

Dr. Merz repeated these tests in August and September of 1972, and found plaintiff's field of vision more restricted. In his examination of plaintiff in May of 1976, a month before this trial, he found the condition still progressing. He diagnosed plaintiff's condition as a post-concussion brain injury with a poor prognosis. He stated there was nothing he could do for her problem.

Dr. Speigel, a neurosurgeon, testified that he first saw plaintiff in July 1972, then in March 1973, and May 1976. According to Speigel, plaintiff told him about the 1969 accident and that she occasionally wore a cervical collar and was still experiencing neck pain at the time of the 1971 accident. Plaintiff also told him of the 1971 accident and complained of headaches and spots and flashes before her eyes. Dr. Speigel testified that he ordered a series of X rays taken and was able to rule out a tumor, abscess or aneurysm as the cause of plaintiff's problem. Speigel testified that all plaintiff's cervical nerves were normal except for the optic nerves. He diagnosed plaintiff's condition as a post-concussion syndrome and a bitemporalhemi-inopsia resulting from an injury to the brain and cervical spine with complete recovery of the cervical spine. Dr. Speigel explained that post-concussion syndrome was a subjective condition and cannot be seen by a doctor. It includes such things as headaches, dizziness, and nausea. He explained that bitemporalhemi-inopsia was a loss of peripheral vision. The patient can see straight ahead but cannot see objects to the side. He stated that this condition can develop over a period

of time or can occur immediately, but the patient may not be aware of it immediately and the problem increases with time. Dr. Speigel felt plaintiff's condition was permanent.

Speigel stated that nothing can be done to cure post-concussion syndrome; it may get better in time, it may not. As to the bitemporalhemiinopsia, he recommended to plaintiff that an angiogram be done. An angiogram, Speigel explained, is a highly technical procedure whereby dye is injected into an artery enabling pictures to be taken of the area around the optic chiasm. Any adhesions which cause this condition would be shown and then surgery would be necessary to remove them. Speigel also explained the complications that could result from such a procedure. Plaintiff did not have an angiogram done.

Dr. Speigel testified that since plaintiff did not complain of eye problems after the 1969 accident, it was his opinion that her condition was caused by trauma, the external force produced by the 1971 accident. However, he admitted that he was not aware that plaintiff had seen her optometrist three weeks before the 1971 accident complaining of reading problems, and that this was a significant factor. He also testified that neck pain is not related to a condition involving the optic nerves.

Dr. Lockhardt, the optometrist, testified that he saw plaintiff on July 8, 1971, at which time plaintiff told him of the 1971 accident, and that she had blurred vision in her right eye and flashing in her left eye. He stated that he refracted her eyes and gave her a new lens prescription. He also stated that he performed a visual field test to determine whether there was a deflection in plaintiff's area of sight but found it to be normal. He testified that he was familiar with the condition of bitemporalhemiinopsia, and from the tests he performed on plaintiff he did not find that condition present. He also testified he changed plaintiff's prescription only once after the 1971 accident.

The jury returned its verdict awarding plaintiff $46,800 in damages, and at the bottom of the verdict wrote the following:

> "Due to the 1969 accident, we as a collective jury are unsure as to the etiology of the present medical problems, and therefore feel that the amount we are awarding is fair and true to the best of our abilities."

Judgment was entered on the verdict. Plaintiff's timely post-trial motion seeking a new trial on damages only was denied.

## I.

■■ As we said in *Spankroy v. Alesky* (1st Dist. 1977), 45 Ill. App. 3d 432, 439, 359 N.E.2d 1078:

> "Where the trial court has denied a motion for new trial, the reviewing court will not disturb the findings of the jury unless the

verdict is against the manifest weight of the evidence. *Cora v. Chicago Housing Authority* (1st Dist. 1971), 131 Ill. App. 2d 23, 29, 268 N.E.2d 497; *cf. Mizowek v. DeFranco.*"

■■■ Before a new trial on the issue of damages alone may be granted, the issues of liability and damages must be so separable that a determination on the issue of damages alone may be had without injustice. (*Paul Harris Furniture Co. v. Morse* (1956), 10 Ill. 2d 28, 46, 139 N.E.2d 275.) The issues are not separable if it appears that the verdict was the result of a compromise on the issue of liability. *Paul Harris Furniture Co. v. Morse.*

■■ Plaintiff here seeks a new trial solely on the issue of damages, while at the same time argues there is a "possibility" that the damages awarded by the jury were the result of a compromise on the question of liability. Plaintiff cites no case authority or evidence from the record to support such an argument. We find nothing in the record to support this theory. As discussed later, we do not find the jury's verdict against the manifest weight of the evidence.

## II.

Rather, we consider plaintiff's contention that the note written on the verdict form indicates the jury's misunderstanding of the evidence presented and the court's instructions. Plaintiff argues that the evidence unequivocally showed that the 1969 accident was in no way related to the injury resulting from the 1971 accident; that the jury misunderstood the evidence; and that this misunderstanding was reflected in an inadequate award to plaintiff.

■■ Compensation for personal injuries is generally a factual question for the jury's determination. (*Romine v. Scott* (2d Dist. 1970), 130 Ill. App. 2d 649, 650, 264 N.E.2d 537.) A verdict is adequate if it is within the range of the evidence presented. (*Beatty v. Wierus* (2d Dist. 1976), 40 Ill. App. 3d 356, 361, 352 N.E.2d 34.) Jury verdicts may be set aside if the verdict is so low as to appear to be a compromise on the issues of liability and damages (*Gainer v. Bates* (1st Dist. 1973), 14 Ill. App. 3d 297, 302 N.E.2d 463); if it is obvious that the jury overlooked or disregarded elements of damages (*Davis v. Yellow Cab Co.* (1st Dist. 1971), 133 Ill. App. 2d 190, 273 N.E.2d 35); if there was an improper admission or exclusion of evidence (*Zielinski v. Goldblatt Bros.* (1st Dist. 1969), 110 Ill. App. 2d 248, 250, 249 N.E.2d 245); if the jury was improperly instructed (*Zielinski v. Goldblatt Bros.*); or, if it could be said that the verdict was rendered as a result of passion or prejudice (*Romine v. Scott*). Where, as here, the plaintiff makes no such contention, and we find nothing in the record, this court must exercise extreme caution in overturning the jury's determination. Then, only where the verdict is grossly and wholly inadequate, will a new trial be granted. *Bledsoe v. Amiel* (1st Dist. 1978),

57 Ill. App. 3d 54, 55-56, 372 N.E.2d 1033; *Giddings v. Wyman* (4th Dist. 1961), 32 Ill. App. 2d 220, 222-23, 177 N.E.2d 641.

■■ The evidence indicates that in Dr. Speigel's opinion, the trauma from the 1971 accident caused plaintiff's injury. But he stated that his opinion was based upon the fact that plaintiff did not complain of reading problems after the 1969 accident. He formed this opinion while unaware that plaintiff had visited an optometrist three weeks before the 1971 accident, which he conceded was a significant factor. He also explained that plaintiff's condition could result immediately, although one may not realize it immediately, or it could develop over a long period of time. Dr. Merz was not informed of the 1969 accident nor of plaintiff's visit to the optometrist three weeks before the accident. Obviously, the jury could consider this evidence in determining the weight it gave to the doctors' opinions regarding the cause of the injury. This evidence could support an inference that the 1969 accident may have been the origin of plaintiff's condition which was aggravated by the 1971 accident. It is the jury's function to assess the credibility of the witnesses and the weight to be accorded their testimony, and to select from among conflicting inferences and conclusions that which is most reasonable. (*Buer v. Hamilton* (5th Dist. 1964), 48 Ill. App. 2d 171, 175, 199 N.E.2d 256.) Merely because the jury could have drawn different inferences or conclusions is not a basis for setting aside a verdict. *Buer v. Hamilton.*

■ Assuming, arguendo, that the 1969 accident was in no way connected to the injury sustained in the 1971 accident, we fail to see how a $46,800 verdict is so grossly inadequate. Plaintiff stressed the seriousness and permanency of the injury. However, the evidence revealed that plaintiff saw her optometrist three weeks after the accident but did not see another doctor until approximately a year later, although she testified to having problems seeing and could not read at all and frequently got headaches, was dizzy and nauseous; that for a span of over three years from March 1973 until a few weeks before this trial commenced in June 1976, there was no evidence that plaintiff sought any medical attention, although she complained that her eyes progressively got worse; that plaintiff returned to school a little over a week after the accident and continued until sometime in 1972; and that there was a possibility that the post-concussion syndrome could get better in time and the bitemporalhemi-inopsia might be corrected by surgery. The evidence relating to pain, suffering, and permanency of the injury was susceptible to widely varying inferences. *Zielinski v. Goldblatt Bros.* (1st Dist. 1969), 110 Ill. App. 2d 248, 253, 249 N.E.2d 245.

Plaintiff listed approximately $1,400 in medical costs, $1,300 in automobile repairs, and $1,650 in lost wages. Thus, at best, the record indicates plaintiff's out-of-pocket expenses totaled somewhere between

$4,000 to $5,000. In closing argument, plaintiff's attorney requested a verdict in excess of $300,000, although the complaint requested $250,000. The only mention of expenses was an amount in excess of $3,000 as representative of plaintiff's lost time and medical bills. The verdict rendered was nearly 10 times the amount of plaintiff's out-of-pocket expenses.

■■ In instructing the jury, the trial court listed the elements plaintiff had the burden of proving: nature, extent and duration of the injury; the resulting disability; pain and suffering; medical expenses; and lost earnings. The jury was instructed that they should determine the amount of damages proximately caused by the 1971 accident. In our opinion, the jury's comment on the verdict form could reflect serious deliberation upon consideration of all the evidence and in accordance with the court's instructions. We find nothing in the comment to justify a new trial. We note that the cases cited by the plaintiff where the court reversed a verdict because of inadequate damages lend no support in the present case since they include situations not existing here.

Based on our search of the record, we find no basis for disturbing the jury's verdict. Accordingly, we affirm the judgment of the circuit court of Cook County.

Judgment affirmed.

PERLIN and HARTMAN, JJ., concur.