RICHARD M. GALL, Plaintiff-Appellant and Cross-Appellee, *v.* METROPOLITAN SANITARY DISTRICT OF GREATER CHICAGO, Defendant-Appellee and Cross-Appellant.

First District (4th Division)   No. 81—2004

Opinion filed September 23, 1982.

Nat Ozmon, Irving D. Fasman, and Rick A. Gleason, all of Anesi, Ozmon, Lewin & Associates, Ltd., of Chicago, for appellant.

Schaffenegger, Watson and Peterson, Ltd., of Chicago (Donald G. Peterson, of counsel), for appellee.

JUSTICE LINN delivered the opinion of the court:

Plaintiff, Richard Gall, brought this action in the circuit court of Cook County to recover damages from the Metropolitan Sanitary District of Greater Chicago (hereafter, the MSD) for injuries he sustained as a result of the MSD's alleged violations of the Structural Work Act (Ill. Rev. Stat. 1975, ch. 48, pars. 60 through 69). A jury held the MSD liable for Gall's injuries and awarded Gall damages in the amount of $25,000.

Gall filed a post-trial motion requesting a new trial on the issue of damages only or, in the alternative, a new trial on all issues; defendant, the MSD, moved for the entry of a judgment *n.o.v.* After the motions were denied, both parties appealed, each requesting a reversal of the denial of the relevant post-trial motion.

The two issues presented for review are (1) whether the MSD was properly held liable under the provisions of the Structural Work Act, and (2) whether the jury's award of damages was so palpably inadequate that a new trial on the issue of damages is required.

We affirm the denial of the MSD's motion for a judgment *n.o.v.* and reverse the trial court's denial of Gall's post-trial motion for a new trial on the issue of damages only.

BACKGROUND

At trial, evidence established that on October 2, 1975, plaintiff Richard Gall, a construction equipment operator employed by Paschen

Construction Company, was assigned to operate a crane at the Stickney Works of the MSD. Gall's job was to dig out accumulated residue from a series of sewage tanks as part of a general rehabilitation project undertaken by the MSD. Such complete emptying of the tanks was done approximately every 20 years so that new access openings, pipe replacement, color coding, or other appropriate improvements could be made. Between these rehabilitative cleanings, the sewage tanks were emptied and cleared by a built-in drainage and flushing system.

The crane involved, a Bucyrus-Erie 60-T Transit Crane, can be equipped with a variety of bucket styles, depending upon the type of digging work to be done. For sludge removal, the crane was fitted with a clamshell bucket, which is operated by two cables which run down the boom to the crane's cab. To keep the bucket from swinging from side to side, another cable, called a tag line, runs from the bucket to a Rudimatic reel, an automatic spring-recoil device mounted on the side of the bottom section of the boom. As the Rudimatic feeds out cable and takes up slack automatically, the bucket is kept stable as it is raised and lowered.

During the week previous to October 2, the crane had been set up by Paschen under the general supervision of the MSD. It had been placed on a narrow roadway between a battery of sewage tanks and a large ditch and field into which the sludge was dumped. Additional hydraulic brackets, called outriggers, had been extended from each side of the crane to give additional support; the outrigger pads had been placed at the edge of the roadway very near the drop-off into the ditch.

When Gall was taken to the worksite on his first day, he pointed out to his supervisor from Paschen that the crane had been assembled with a 90-foot boom instead of the standard 60-foot boom, the cable capacity of the particular model Rudimatic reel being used was too small for the boom length, and the reel had been mounted on the right side of the boom instead of the left (the instructions accompanying the reel specified that it be mounted on the side of the boom away from the operator's cab, which was on the right side of the crane body). In response to Gall's remarks, his supervisor told him that the crane had been operating satisfactorily for a week, and he would receive extra "long-boom" pay.

Approximately three hours after beginning work, Gall had swung the boom to the right and lowered the bucket into one of the tanks when he heard a loud bang, and the tag line cable went slack. In Gall's experience, that noise accompanied by sudden slackness in the

cable happened when the tag line broke inside the reel; as a result, the spring recoil device could not take up the cable slack when the boom was lifted and the bucket raised. In order to check and possibly correct the problem, Gall lifted the bucket, raised the boom, swung it back to the left over the roadway, and then lowered the boom so he could reach the faulty Rudimatic reel. Because the reel was mounted on the right side, the movement of the boom from right to left allowed the slack cable to drape onto the ground on the right side of the boom.

Gall testified that to secure the reel before beginning any inspection, he had to leave the cab, walk along the fender of the crane, jump to the ground, and cross to the side of the boom opposite the reel to wedge a block of wood between the spokes. This method of braking the reel was specified in the Rudimatic manual because that particular small model had no safety brake operable from inside the cab. Also, Gall jumped down from the crane on the right side because the door to the cab was on the right and the outriggers, extended as they were to the edges of the roadway, prevented him from easily walking around the back of the crane.

Both Gall and his operating assistant, Gene Pugh, testified that as Gall began to walk under the lowered boom, the Rudimatic reel suddenly regained its spring tension and the cable snapped back, catching Gall by the leg and throwing him up into the air. The whipping cable ripped off his pants leg and tore through most of his right calf.

Gall was taken immediately to the emergency room of MacNeal Memorial Hospital, where, according to the testimony of the attending physician, Dr. Asok Ray, he was given special care because his injury had occurred on disease-infested ground. Despite the massive doses of antibiotics and penicillin Gall received, however, the leg developed gas gangrene. Five separate operations over several weeks were needed to re-attach the calf, to excise repeatedly the necrotic flesh, and to graft skin from the left thigh over the damaged area. Between operations, Gall endured daily whirlpool baths in which antiseptic was jetted onto his leg.

Gall was unable to walk at all for several weeks following the operations. He gradually progressed from a walker to crutches, and finally to a cane. During this rehabilitation period, the added stress on his spine caused such severe back pain that he had to be fitted with a back brace. When he returned to work in February 1976, about five months after being injured, adjustments were made in the brake setup of the crane he operated so that he would not have to use his damaged leg. Planks were set up as a ramp to enable him to climb up to

the cab, and he had to rest frequently and elevate his leg to relieve the persistent swelling. Although Gall has recovered sufficiently to return to work, his leg is permanently impaired, and he is permanently unable to operate certain types of heavy equipment. The operations to remove gangrenous flesh caused irremediable muscle loss. Other muscles display some atrophy, his limp is pronounced, and movement in the knee, ankle and foot is seriously limited.

OPINION

I

The threshhold question in this appeal is whether the MSD can be held liable for Gall's injuries. Such liability would result if the three elements necessary for liability under the Structural Work Act (Ill. Rev. Stat. 1975, ch. 48, pars. 60 through 69) can be attributed to the MSD. The pertinent sections of the Structural Work Act provide as follows:

> "[A]ll scaffolds, hoists, cranes, stays, ladders, supports, or other mechanical contrivances, erected or constructed by any person, firm or corporation in this State for the use in the erection, repairing, alteration, removal or painting of any house, building, bridge, viaduct, or other structure, shall be erected and constructed, in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon, or passing under or by the same, and in such manner as to prevent the falling of any material that may be used or deposited thereon." Ill. Rev. Stat. 1975, ch. 48, par. 60.

> "Any owner, contractor, sub-contractor, foreman or other person having charge of the erection, construction, repairing, alteration, removal or painting of any building, bridge, viaduct or other structure within the provisions of this act, shall comply with all the terms thereof * * *.
> * * *

> For any injury to person or property, occasioned by any wilful violations of this act, or wilful failure to comply with any of its provisions, a right of action shall accrue to the party injured, for any direct damages sustained thereby; * * *." Ill. Rev. Stat. 1975, ch. 48, par. 69.

In this appeal of the denial of its post-trial motion for a judgment *n.o.v.*, the MSD argues that (1) the specific work Gall was doing for the MSD did not fall within the scope of the Structural Work Act; (2)

if the work was covered by the Structural Work Act, the MSD was not the party having charge of the work and therefore may not be held liable; and (3) if the MSD was in charge, its actions were neither wilful violations of the Act nor a proximate cause of Gall's injuries.

■ The trial court record indicates that the first two elements necessary for a finding of liability on the part of the MSD were dealt with by means of motions. When the defendant moved for a ruling that Gall's activity did not fall within the scope of the Structural Work Act, the motion was denied. Gall was operating a crane being used to remove accumulated residue as part of an overall rehabilitation of certain sludge tanks. Defendant argues that Gall's actual work was construction site preparation, an activity not covered under the statutory language, "repairing, alteration, removal or painting" of a structure (Ill. Rev. Stat. 1975, ch. 48, par. 60). However, it is clear to us that the cleaning was necessary to enable repair and alteration work to be done to the tanks. Caulking was needed, pipes in the tank were to be replaced and painted, and additional access openings were to be cut. The tanks themselves were already structures within the purview of the Act (see *Navlyt v. Kalinich* (1972), 53 Ill. 2d 137, 290 N.E.2d 219), so Gall's preparation work was not in mere anticipation of construction but was the necessary first step in a contractually specified plan of repair and alteration.

■ In regard to the second element of liability, whether the defendant was a person in charge of the work, the trial judge ruled as a matter of law that the MSD was an entity in charge of the construction operation. This ruling was based on the testimony of Frank Samuelson, senior mechanical engineer for the MSD. He stated that the MSD was the owner of the worksite, maintained an office and staff there, had the authority to change or stop unsatisfactory work being done by the contractors, and inspected and approved all materials used on the worksite. Further, the MSD maintained a safety division which established safety standards, approved the contractors' safety manuals, and observed the contractors' work to insure that it was performed in a safe and proper manner. Although it is true that Paschen retained control over its employees and equipment, more than one person may be in charge of the work and be liable to an injured party under the Structural Work Act. (*Mosley v. Northwestern Steel & Wire Co.* (1979), 76 Ill. App. 3d 710, 394 N.E.2d 1230.) Based upon the record before us, we necessarily conclude that the MSD properly was found to be in charge of the construction within the purview of the Structural Work Act.

■ The third element necessary to a finding of liability under the

Structural Work Act is that the entity in charge of the work proximately caused the plaintiff's injuries. One purpose of the Act is "to place full responsibility for employee injuries upon the person in charge of the work who wilfully violates the provisions of the act." (*McNellis v. Combustion Engineering, Inc.* (1973), 13 Ill. App. 3d 733, 742, 301 N.E.2d 96, 104, *aff'd* (1974), 58 Ill. 2d 146, 317 N.E.2d 573.) However, "[f]or there to a 'wilful violation' of the Structural Work Act, the defendant must either have known of, or in the exercise of ordinary care, could have known of the dangerous condition." (*Kjellesvik v. Commonwealth Edison Co.* (1979), 73 Ill. App. 3d 773, 775-76, 392 N.E.2d 116, 118.) The record discloses that when Gall first saw the crane, he stated to his supervisor that the crane boom was too long for the size Rudimatic reel being used, and the reel was mounted on the wrong side of the boom. While it is true that under his union's bargaining agreement Gall had authority to voice complaints concerning work or equipment safety only to his immediate supervisor, Gall testified that his remarks were made in the presence of a man from the MSD and Gene Pugh, the person assigned to be Gall's oiler. Further, the Rudimatic manual on file with the MSD clearly stated that appropriate safety precautions to observe when mounting the particular reel model involved in this case included using that reel on a boom of 40 to 60 feet maximum, not 90 feet, and mounting the reel on the side of the boom opposite the crane operator's cab. Finally, Gene Pugh, Gall's assistant, testified that during the week previous to Gall's arrival at the site, he frequently observed the bucket begin to swing as the tag line periodically went tight, then slack. After a few of these incidents, the crane operator had left the crane to talk to two men from the MSD, then had returned to work on the crane. It is reasonable to conclude from all these circumstances that the MSD had notice of the dangerous condition, and that there was sufficient evidence by which the jury could find that the MSD, as an entity in charge of the work, was liable for injuries caused by its wilful violation of the Structural Work Act.

The record also discloses that the MSD could not show that the sole cause of the accident was something other than the action of the MSD (see *Frake v. Paschen Contractors, Inc.* (1969), 113 Ill. App. 2d 403, 252 N.E.2d 14). In that connection, we are aware that once a wilful violation of the Act by the entity in charge has been shown to be at least one proximate cause of plaintiff's injury, concurrent fault is not a defense to liability under the Act. (*Beebe v. Commonwealth Edison Co.* (1977), 45 Ill. App. 3d 43, 358 N.E.2d 1343.) The Structural Work Act "extends liability to those having some responsibility and

opportunity to prevent dangerous work methods at the construction site in general, without regard to their having a direct supervisory connection with the particular task which gave rise to the injury." *Hausam v. Victor Gruen & Associates* (1980), 86 Ill. App. 3d 1145, 1149, 408 N.E.2d 1051, 1054.

The MSD presented some evidence that brush could have caught in and temporarily blocked the reel; when the brush dislodged, the reel was freed and the line snapped taut. However, neither Gall nor Pugh testified that they observed brush caught in the reel before Gall jumped down from the crane. In fact, the evidence presented established the possibility that what was seen caught in the reel after Gall was injured was the lower part of his pants leg that had been torn off by the cable. It is clear that although evidence was conflicting, there was legally sufficient credible evidence presented from which the jury could find the MSD liable under the Structural Work Act.

■ In deciding whether the defendant was entitled to a judgment *n.o.v.*, the trial court applied the standard established in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14:

> "[J]udgments *n.o.v.* [ought to be] entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand."

Considering the totality of the evidence presented in the instant case and then applying the *Pedrick* standard, we find no error in, and therefore affirm, the trial court's denial of the MSD's post-trial motion for a judgment *n.o.v.*

## II

The second issue to be considered is whether the trial court erred in denying Gall's motion for a new trial on the issue of damages only. In response to Gall's request for damages in the amount of $195,000, the jury awarded him only $25,000. Uncontested medical expenses added up to $11,577, and lost wages were calculated at $8,602, leaving approximately $5000 as compensation for the pain, suffering, and permanent disability.

Gall contends that the amount of the verdict is palpably erroneous and must be the result of either the jury's misunderstanding the court's instructions on the issue of damages or the jurors' conclusion that evidence of Paschen's actions and Gall's own conduct could be considered as significant contributions to Gall's injuries. The MSD, on the other hand, argues that because a reviewing court should not dis-

turb the findings of a jury unless the verdict is against the preponderance of the evidence (*Spankroy v. Alesky* (1977), 45 Ill. App. 3d 432, 359 N.E.2d 1078), and the verdict, although low, is within the range of the evidence (*Beatty v. Wierus* (1976), 40 Ill. App. 3d 356, 352 N.E.2d 34), no new trial on the issue of damages should be granted. We agree with Gall that the damages awarded are manifestly inadequate; and when "the amount of the verdict bears no reasonable relationship to the loss suffered by the plaintiff, the verdict·may be overturned." *Stamat v. Merry* (1979), 78 Ill. App. 3d 445, 448, 397 N.E.2d 141, 144.

■■ *Eckdahl v. Lease-a-Plane International Licensing Corp.* (1979), 69 Ill. App. 3d 864, 388 N.E.2d 62, establishes that jury verdicts may be set aside if the verdict is so low that it is obvious the jury overlooked or disregarded elements of damages (*Davis v. Yellow Cab Co.* (1971), 133 Ill. App. 2d 190, 273 N.E.2d 35), or if there was an improper admission or exclusion of evidence. (*Zielinski v. Goldblatt Brothers, Inc.* (1969), 110 Ill. App. 2d 248, 249 N.E.2d 245; *Eckdahl* goes on to list three other triggering situations not applicable here.) We agree with Gall that both of these considerations were factors contributing to the jury's rendering a verdict so "grossly and wholly inadequate" that a new trial on the issue of damages must be granted. *Bledsoe v. Amiel* (1978), 57 Ill. App. 3d 54, 55-56, 372 N.E.2d 1033, 1035.

The record discloses that the trial judge, after granting Gall's motion *in limine* to exclude all mention of Gall's own conduct and the possibility of contributory negligence, allowed defense counsel, during cross-examination, to develop a detailed account of Gall's actions at the scene of the accident. Although Gall's attorney objected repeatedly, the evidence was admitted. Counsel renewed the motion *in limine* prior to closing arguments to preclude the attorney for the MSD from repeating that evidence during closing argument. This time, the court instructed defense counsel that he was not to address the issue of Gall's possible negligence; however, the evidence elicited during extensive cross-examination was never stricken. It is a settled rule of law that contributory negligence does not constitute an affirmative defense under the Structural Work Act. (*Smith v. Georgia Pacific Corp.* (1980), 86 Ill. App. 3d 570, 408 N.E.2d 117.) Any testimony regarding Gall's conduct was immaterial and irrelevant because concurrent fault is not a defense to liability under the Act. (*Beebe v. Commonwealth Edison Co.* (1977), 45 Ill. App. 3d 43, 358 N.E.2d 1343.) Based on the record, it clearly appears the jury inferred from the testimony concerning both Gall's and Paschen's conduct that the

liability of the MSD should be reduced. This was improper. Even though the jury was instructed specifically that Gall's conduct should not be a factor in the deliberations, neither should the conduct of Paschen have been considered by the jury.

■■ The damages awarded to Gall covered his out-of-pocket expenses but were clearly not commensurate with the uncontroverted pain, suffering, and permanent injuries shown by the record. (*Rapp v. Kennedy* (1968), 101 Ill. App. 2d 82, 242 N.E.2d 11.) A new trial only on the issue of damages may be granted where, as here, the damage issue is so separable and distinct from the issue of liability that a trial solely on that issue may be had without injustice. (*Stamat v. Merry* (1979), 78 Ill. App. 3d 445, 397 N.E.2d 141.) We conclude, therefore, that in light of the jury's palpably inadequate award of damages and the severability of the issues of liability and damages, the trial court's denial of Gall's motion for a new trial should be reversed and a new trial granted on the issue of damages only. (*Kern v. Uregas Service of West Frankfort, Inc.* (1980), 90 Ill. App. 3d 182, 412 N.E.2d 1037.) Accordingly, we so order. For the reasons set forth we affirm the trial court's ruling denying the motion of the MSD for judgment *n.o.v.*; we reverse the trial court's ruling denying plaintiff's motion for a new trial on the issue of damages only.

Affirmed in part; reversed in part and remanded for a new trial on the issue of damages only.

JOHNSON, P. J., and JIGANTI, J., concur.