RICHARD HOLLIS, Plaintiff-Appellant, *v.* R. LATORIA CONSTRUCTION, INC., Defendant-Appellee.

First District (5th Division)   No. 82—1151

Opinion filed September 9, 1983.—Rehearing denied March 28, 1984.

Brian J. McManus, of Brian J. McManus and Associates, Ltd., of Chicago (Daniel F. Capron, of counsel), for appellant.

Crooks & Gilligan, Ltd., of Chicago (John W. Gilligan, of counsel), for appellee.

JUSTICE MEJDA delivered the opinion of the court:

Plaintiff, Richard Hollis, appeals from the circuit court's denial of his post-trial motion, which sought a new trial on damages only or, alternatively, a new trial on all issues. The circuit court had entered judgment on a jury verdict of $30,000 in favor of plaintiff and against defendant, R. Latoria Construction, Inc. On appeal, plaintiff asserts that the trial court erred in denying his post-trial motion in that the jury's verdict was inadequate and against the manifest weight of the evidence. For the reasons which follow, we reverse the order denying the post-trial motion and remand for a new trial on the issue of damages only.

Plaintiff brought this suit under the Structural Work Act (Ill. Rev. Stat. 1981, ch. 48, pars. 60 through 69) against defendant to recover damages for injuries sustained when plaintiff fell through an open skylight on April 19, 1977. On that day plaintiff was employed as a roofer by a subcontractor at the construction site of an addition to the Industrial Fasteners and Supply Company building in Franklin Park, Illinois. The defendant, R. Latoria Construction, Inc., was the general contractor for the construction.

Rocco Latoria testified that he is engaged in the general contracting business through R. Latoria Construction, Inc. He had contracted to build an addition to the Industrial Fasteners and Supply Company

plant and had hired several subcontractors to perform various phases of that work. Latoria visited the construction site two or three times a day in March and April of 1977. Every day he noticed that each of the seven 4 feet by 4 feet skylight holes was open. He testified that he had the authority to stop work if the subcontractors were performing improperly, but he asserted that this authority did not include the right to stop work for safety violations. He testified on cross-examination that each trade was responsible for its own safety rules and protection. On redirect examination by plaintiff, Latoria testified that protective planking would have been placed over the open skylight holes if the plans had so specified, which they did not. Latoria stated that "[g]uardrails and safety measures are all part of the plans and specifications." He admitted that he had hired the architect and the draftsman who drew up the plans and that he, Latoria, had the right to direct these people to provide in the plans for plywood covers for the open holes until the skylight domes were installed.

Daryl Torgerson, who is a self-employed roofer, testified that customarily in the construction and roofing trade, the general contractor is responsible for safety on the job and has the right to stop the work for dangerous conditions created by a subcontractor's performance. He testified that the pay rate is now $15.80 for a journeyman roofer, and that other benefits include health and welfare, pension, and vacation benefits. Torgerson also testified on cross-examination that the construction industry has been "way off" the past three years and that he had worked 40-44 weeks per year between 1970 and 1978. He did not indicate how many weeks he worked in each of the subsequent years.

Louis Jacobs is a consulting architect and safety engineer. He testified that according to the custom and practice in the industry, the general contractor is in charge of safety. He further testified that the general contractor assumes the entire responsibility for safety, while the subcontractors share joint responsibility with the general contractor for subcontracted work. Jacobs also indicated that various industry and government codes require railings, guardrails, toeboards, or covers over open skylights. In his opinion, the construction project "with the openings in the roof for seven skylights is in violation of all code and standard rules and regulations." The specific violation was "the leaving of the skylight open without any protective devices."

Plaintiff testified that on the day of the accident he slept late and got to the job site around 9 a.m. The roof of the addition was made of corrugated sheet metal with six or seven open skylights already installed. The sheet metal roof contained ridges and channels which ran

the full length of the roof. The ridges were about three inches wide and were separated from each other by the channels which are about an inch and a half wide. Plaintiff was operating an adhesive-spreading machine as part of the roofing operation. This machine has wheels which should remain on the ridges of the roof during the adhesive-spreading process so that the adhesive is applied to the ridges, on which the other roofing material will rest. The machine is usually operated by pulling it behind the operator, to avoid walking through the freshly applied adhesive. The operator typically walks backward or sideways in order to observe the wheels of the machine and to keep them properly tracked on the ridges. On the morning of the accident, plaintiff was pulling the machine with his left hand and walking sideways. He finished spreading adhesive between the first and second skylight and then started the spreader between the next pair of skylights. At this time he fell backwards. His left leg hit the back of the skylight opening and he fell about 18 feet to a hard-packed dirt floor, landing on his hands and knees.

Initially, plaintiff felt no pain and tried unsuccessfully to stand up. His arms were "distorted" and his left elbow and right wrist were obviously fractured. An ambulance arrived in about 10 minutes, by which time he had shooting plains in his right arm and left elbow and a throbbing pain in his left knee. He was admitted to a local hospital where he was X-rayed. Dr. Milos performed a surgical procedure during which plaintiff was under a general anesthetic. He awoke with a cast on his left leg from the ankle to the thigh, and a cast on both of his arms. He remained in the hospital for seven days.

When plaintiff was discharged from the hospital he was unable to walk. He could open and close his left hand but could not bend his left arm at the elbow, which also suffered from a throbbing pain. An area on the top of the left forearm was numb. Plaintiff could bend his left leg very slightly and could walk on it some, although with a limp. The leg was weak, with a "dull" sensation around the knee. His right wrist developed shooting pains which ran to the elbow.

Plaintiff underwent physical therapy three times a week for two months and then once a week for two months. At the end of this time he was still unable to bend his left arm. In September of 1977 he underwent a second surgical procedure and was hospitalized for three days. Another cast was placed on the arm and remained there for five weeks. At the end of that time, Dr. Milos removed the cast. Plaintiff was able to bend the arm somewhat.

Plaintiff testified that he currently experiences various types of pain in his extremities, especially during weather changes, that his

knee will not support him if he walks a long way or up steep steps, and that he is physically unable to perform manual labor for periods of time exceeding a half hour.

Plaintiff also testified that at the time of his fall he was able-bodied with no physical problems, except for a bad ear. He was a journeyman roofer making $11.50 an hour when he was injured. The union hourly wage scale increased to $12.30 on June 1, 1978, to $13.05 in 1979, $14.30 in 1980, and $15.80 in 1981. These hourly rates did not reflect other additional benefits, including pensions. Plaintiff testified that he worked between 45 and 48 weeks each year. After his fall, he did not work at all for a year and a half. He presently drives a delivery truck for $5 per hour.

John Megall, Jr., president of plaintiff's former employer, testified that plaintiff worked 41 weeks in 1975 and 34 weeks in 1976, and that full-time employees worked an average of 38 weeks per year. He indicated that roofing crews did not work during snow and cold weather.

Dr. Alvin Kanter is a physician and orthopedic surgeon. He testified that he examined plaintiff on several occasions beginning on July 22, 1977, which was after plaintiff had been discharged from the hospital for the first time and after the casts had been removed for the first time. Plaintiff complained of residual limitation of motion and discomfort in the left elbow and discomfort in the right wrist. The left wrist exhibited some deformity, limitation of motion, and discomfort on extremes of motion. The left elbow exhibited substantially significant limitation of motion: only 10° toward himself and 15° away. There was "absolutely no pronation" of the palm. X rays revealed a residual fracture deformity with a medial fracture of the distal radius. Some calcification along the ligaments and lining of the joints with the displaced fragments of the radial head was also apparent. Plaintiff had suffered a fracture dislocation of the left elbow, which meant that the elbow was dislocated and the radial head was fragmented, with pieces lodging in the joints.

Dr. Kanter subsequently examined plaintiff on December 29, 1981, after plaintiff had undergone a second surgery. This operation improved the range of motion although it was still "significantly limited," particularly the ability to pronate the hand. Whereas a normal pronation is 90°, plaintiff was only able to pronate his palm about 10°. The left elbow remained unable to straighten fully and the right wrist suffered from a limited palmar flexion. A normal flexion is 90° and plaintiff could achieve only 75° due to a deformed and tilted radius. Two healed fracture lines observable on X rays accounted for

the deformity. X rays indicated that the left elbow joint was not smooth, but had irregularities, including a spur off the humerus, almost abutting the radial head. This created an area of potential blockage to the elbow joint and indicated the presence of arthritis in the joint. This type of arthritis tends to be progressive and degenerative with time. This condition accounts for plaintiff's complaints of stiffness, constant aching, and increased discomfort with weather changes as well as the limitation of motion of the elbow. The inability to use the arm normally leads to a generalized atrophy in the upper left arm. Surgical removal of the spur would improve use of the arm, although it would not fully restore it, and there is a significant chance that spurring will recur after the operation.

Dr. Kanter testified that the left knee suffered atrophied muscles, limitation of motion, grating along the inside of the knee joint, and tenderness along the medial joint line. This is consistent with internal derangement of the joint, specifically a tear of the medial meniscus cartilage. Without treatment, this condition can cause arthritis and bring about significant arthritic changes within 20 years. Dr. Kanter recommended arthroscopic surgery to treat this condition.

Dr. Kanter testified that, in his opinion, the wrist injury alone was sufficient to cause disability in work. The conditions of both arms and the knee are permanent if untreated. Even with surgery, the injury to the right wrist and left elbow are permanent. In his opinion, plaintiff is unable to return to roofing work or any other construction trade.

The defense presented limited testimony. On section 60 examination plaintiff testified that he had backed into the open skylight. The defense presented no medical or other expert witnesses. Prior to trial the defendant had filed an "affirmative defense" which alleged that the sole proximate cause of the plaintiff's injuries was his own misconduct. At the close of the evidence, the trial court struck the defense. During closing argument, however, defense counsel argued that plaintiff was the proximate cause of the accident.

> "The way he was doing his work was improper. If he was doing his job properly there would have been no accident. I submit to you that Mr. Hollis himself was the proximate cause of this accident and I'll submit to you further that the way this accident occurred, he could have walked off the roof of the building just as easily as backed into that hole. Every one of us has to conduct ourselves [sic] in a certain careful way.
>
> [Plaintiff's counsel]: Your Honor, I'm going to object to his line of comments. It's beyond the Structural Work Act and contrary to its terms.

THE COURT: You may proceed.

[Defense counsel]: In everything we do, we must do it in a reasonable method or manner. We cannot just go willy-nilly across the middle of the street in heavy traffic and close our eyes, for instance. The law of the Structural Work Act was not intended to protect careless people who fall into holes. The Structural Work Act is a good law. It sets out certain things that are just common sense. It is not intended—No law is intended to protect the foolish behavior and reckless wanton conduct.

[Plaintiff's counsel]: Same objection."

After a sidebar conference, the objection was overruled.

After being instructed by the court, the jury deliberated and returned a verdict of $30,000 in favor of the plaintiff and against the defendant. The trial court denied plaintiff's post-trial motion and plaintiff has appealed.

OPINION

■■■ Plaintiff contends that because the damages awarded by the jury were palpably inadequate, he is entitled to a new trial on damages only or, alternatively, on all issues. The general rule is that

"the amount of damages to be awarded is within the jury's sound discretion. That discretion, however, is not without limitation. [Citation.] If the damages awarded are manifestly inadequate or if an important element of the damages has been overlooked, then the reviewing court may order a new trial for inadequacy of damages. [Citations.] When the amount of the verdict bears no reasonable relationship to the loss suffered by the plaintiff, the verdict may be overturned." (*Stamat v. Merry* (1979), 78 Ill. App. 3d 445, 448, 397 N.E.2d 141.)

In the instant case, the plaintiff was unemployed for 18 months after his fall. This period of unemployment occurred before the general depression of the construction industry which, according to trial testimony, began sometime in 1979. The evidence indicated that the average full-time roofer at plaintiff's place of employment worked 38 40-hour weeks per year. During 1975 and 1976, the only full years in which plaintiff was employed as a roofer, his employer testified that he worked 41 and 34 weeks, respectively. Taking the lowest figure in evidence, 34 weeks, as the basis for calculation, for the first year after plaintiff's fall, he lost 1,360 hours at $11.50 per hour for a wage loss of $15,640. During the subsequent six months he would have worked 17 weeks or 680 hours at $12.30 for a wage loss of $8,364.

This is a total wage loss of slightly over $24,000. There is no evidence that plaintiff would have worked fewer hours, been laid off, or worked for lower wages. Although there was some indication that roofing was a seasonal business, we believe the 34-week figure adequately accounts for seasonal variations. Consequently, the wage loss was sufficiently established. (*Kelty v. Wiseman Construction Co.* (1976), 38 Ill. App. 3d 808, 812, 349 N.E.2d 108.) This $24,000 figure does not include wages lost as a result of taking much lower-paying jobs upon eventually re-entering the work force. Yet, the remaining $6,000 awarded by the jury was supposed to compensate plaintiff for his loss of future earnings, his past and future pain and suffering, and his disability and disfigurement resulting from the injury. In view of the extent and permanence of plaintiff's injuries, the damages awarded by the jury are manifestly inadequate. See *Stamat v. Merry* (1979), 78 Ill. App. 3d 445, 448, 397 N.E.2d 141.

Because we have concluded that the damages awarded are inadequate, we must now determine whether a new trial on all issues or on damages only is appropriate. 78 Ill. App. 3d 445, 449.

"[A]n appellate court may set aside an inadequate verdict and order a new trial solely on the issue of damages in a proper case, that is, in a case where the damage issue is so separable and distinct from the issue of liability that a trial of it alone may be had without injustice." (*Paul Harris Furniture Co. v. Morse* (1956), 10 Ill. 2d 28, 46, 139 N.E.2d 275.)

The supreme court has interpreted this holding as involving a three-step analysis. (*Balestri v. Terminal Freight Cooperative Association* (1979), 76 Ill. 2d 451, 456, 394 N.E.2d 391; *Robbins v. Professional Construction Co.* (1978), 72 Ill. 2d 215, 224, 380 N.E.2d 786.) A new trial on the question of damages only is appropriate where

"(1) the jury's verdict on the question of liability is amply supported by the evidence; (2) the questions of damages and liability are so separate and distinct that a trial limited to the question of damages is not unfair to the defendant; and (3) the record suggests neither that the jury reached a compromise verdict, nor that, in some other identifiable manner, the error which resulted in the jury's awarding inadequate damages also affected its verdict on the question of liability." *Robbins v. Professional Construction Co.* (1978), 72 Ill. 2d 215, 224.

The initial inquiry in our analysis is whether the jury's verdict on the question of liability is "amply supported by the evidence ***." (*Robbins v. Professional Construction Co.* (1978), 72 Ill. 2d 215, 224.) The defendant's potential liability in the case *sub judice* is imposed by

the Structural Work Act (Ill. Rev. Stat. 1981, ch. 48, pars. 60 through 69), which provides in pertinent part that:

"Any owner, contractor, sub-contractor, foreman or other person having charge of the erection, construction, repairing, alteration, removal or painting of any building, bridge, viaduct or other structure within the provisions of this act, shall comply with all the terms thereof ***.

* * *

For any injury to person or property, occasioned by any wilful violations of this Act, or wilful failure to comply with any of its provisions, a right of action shall accrue to the party injured, for any direct damages sustained thereby; ***." (Ill. Rev. Stat. 1981, ch. 48, par. 69.)

Under this statute liability accrues to a person who has charge of the work and who commits a wilful violation of the statute which proximately causes plaintiff's injury. (See *McInerney v. Hasbrook Construction Co.* (1975), 62 Ill. 2d 93, 101-02, 338 N.E.2d 868.) The expert testimony was evidence of a violation of the statute in that the failure to cover or guard the open skylight violated various safety standards. (*Bishop v. Crowther* (1980), 92 Ill. App. 3d 1, 13, 415 N.E.2d 599.) Latoria's testimony that he saw the open skylights every time he visited the construction site established the wilful nature of the violation within the meaning of the statute. (*McInerney v. Hasbrook Construction Co.* (1975), 62 Ill. 2d 93, 102, 338 N.E.2d 868 ("wilful" means "knowing" in context of the Structural Work Act).) These issues have not been pursued on appeal. Defendant argues, however, that its liability was not sufficiently established because the evidence conflicted on whether it was "in charge of" the work within the meaning of the statute. The question of who has charge of the construction is a question of fact for the jury. (*Norton v. Wilbur Waggoner Equipment Rental & Excavating Co.* (1979), 76 Ill. 2d 481, 485, 394 N.E.2d 403.) A mere conflict in the evidence is insufficient to undermine the jury's assessment of liability (see 76 Ill. 2d 481, 491); the record need only demonstrate that there was sufficient evidence from which the jury could find that the defendant "was one of the persons 'having charge of' the construction ***." (*Emberton v. State Farm Mutual Automobile Insurance Co.* (1978), 71 Ill. 2d 111, 123, 373 N.E.2d 1348.)

"The term 'having charge of' is a generic term of broad import, and although it may include supervision and control, it is not confined to it. As was said of the word 'charge' in *People v. Gould*, 345 Ill. 288, 323: 'The word does not necessarily include custody, control or restraint, and its meaning must be deter-

mined by the associations and circumstances surrounding its use. "To have charge of" does not necessarily imply more than to care for or to have the care of.' Thus, while the actual exercise of supervision and control over the work and the persons doing it, or the retention of the right to so supervise and control, may be factors bearing on the ultimate factual question of whether an owner is 'in charge,' they are not necessary or conclusive factors, nor is either made a *sine qua non* for liability under the statute." (*Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316, 321-22, 211 N.E.2d 247.)

In the instant case, testimony concerning the right to stop work and the responsibility for safety was conflicting. The jury could have concluded from this testimony that the defendant was in charge of the work. Even more telling, in our view, is Rocco Latoria's testimony that safety measures are part of the plans for a job and that planking would have covered the open holes had he instructed the architect and draftsmen to provide so in the plans. This demonstrates a sufficient degree of control over this aspect of the construction to warrant a finding that defendant was in charge of the work. We conclude that the record discloses a sufficient evidentiary basis for the jury's finding of liability.

■ The next step in our analysis is whether the questions of damages and liability are so distinct that a trial limited to the question of damages is not unfair to the defendant. (*Robbins v. Professional Construction Co.* (1978), 72 Ill. 2d 215, 224, 380 N.E.2d 786.) Under the Structural Work Act the question of liability is not complicated by issues of contributory negligence or concurrent fault, as these are not defenses to the liability imposed by the statute. (*Gall v. Metropolitan Sanitary District* (1982), 109 Ill. App. 3d 502, 510, 440 N.E.2d 973.) The standard of liability under the statute is not negligence but wilfulness. (See *Vegich v. McDougal Hartmann Co.* (1981), 84 Ill. 2d 461, 466, 419 N.E.2d 918.) The unavailability of these defenses renders the issue of liability so distinct from the question of damages that we perceive no prejudice to the defendant in a retrial limited to the latter issue.

■ The third area of inquiry is whether the record suggests that the jury reached a compromise verdict or that some other error which resulted in the jury's awarding inadequate damages also affected its verdict on the question of liability. (*Robbins v. Professional Construction Co.* (1978), 72 Ill. 2d 215, 380 N.E.2d 786.) In our judgment, the jury's inadequate damage award does not indicate a compromise on the issue of liability, but rather is directly traceable to defense coun-

sel's improper closing arguments. As noted above, a plaintiff's contributory negligence is not a defense to the liability imposed by the Structural Work Act and testimony concerning a plaintiff's culpable conduct is therefore irrelevant in a suit brought under the statute. (*Gall v. Metropolitan Sanitary District* (1982), 109 Ill. App. 3d 502, 510, 440 N.E.2d 973; *Smith v. Georgia Pacific Corp.* (1980), 86 Ill. App. 3d 570, 573, 408 N.E.2d 117.) Of course, "it is still necessary that the statutory violation of the defendant be a contributing cause of plaintiff's injury to sustain liability under the Act. [Citation.] Where the statutory violation does not contribute to proximately cause plaintiff's injury, and where *only plaintiff's negligence causes the injury*, then no liability arises under the terms of the statute." (Emphasis added.) (*Smith v. Georgia Pacific Corp.* (1980), 86 Ill. App. 3d 570, 573.) This statement of the law does not contemplate a "but for" analysis of a plaintiff's conduct as a cause of his injuries; all that is required is that the statutory violation "contributes" to cause plaintiff's injuries.

■ In the instant case, there is no question that the failure to cover the skylight hole was a contributing cause of plaintiff's injuries and it follows, therefore, that plaintiff's own negligence was not the sole proximate cause of his injuries. The trial court's striking of the affirmative defense at the close of the evidence tacitly supports this conclusion. Significantly, the defendant has not challenged on appeal the propriety of this action. Accordingly, plaintiff's misconduct was not an issue in the case at the closing argument stage. Nonetheless, defense counsel's argument not only drew the jury's attention to the plaintiff's carelessness, but went so far as to impute wilful and wanton misconduct to the plaintiff with comments such as "No law is intended to protect the foolish behavior and reckless wanton conduct." Plaintiff's timely objections to this and similar remarks were overruled by the trial court. These comments were not relevant to any issue in the case and were obviously prejudicial. Under these circumstances, it is readily apparent that the jury reduced the damages awarded to plaintiff as a result of the improper argument. (See *Gall v. Metropolitan Sanitary District* (1982), 109 Ill. App. 3d 502, 510-11, 440 N.E.2d 973, 980.) We conclude that, in light of the jury's palpably inadequate damage award, the ample evidence of defendant's liability (including the expert testimony and Latoria's own testimony), the severability of the liability and damage issues, and the lack of evidence indicating a compromise verdict, the trial court's denial of plaintiff's post-trial motion should be reversed and a new trial granted on the issue of damages only.

Other issues presented for decision are unlikely to reoccur on retrial of this cause and therefore are unnecessary for decision (see *Spunar v. Clark Oil & Refining Corp.* (1977), 53 Ill. App. 3d 477, 480, 368 N.E.2d 990).

For the reasons stated, the order denying plaintiff's motion for a new trial is reversed and the cause is remanded for a new trial on the issue of damages only.

Order reversed; remand as to damages only.

WILSON, P.J., and SULLIVAN, J., concur.